EDITH A. WILSON, Doing Business as THE ROYAL PHEASANT RESTAURANT, Plaintiff, v. CARL HACKER, Individually and as International Vice-President of Hotel and Restaurant Employees International Alliance and Bartenders League of America, Affiliated with American Federation of Labor, et al., Defendants.

Supreme Court, Trial Term, Erie County, November 13, 1950.

*Samuel A. Magistrale* for plaintiff.

*Leo Winer* for Charles O'Neill, individually and as business agent of Buffalo Bartenders League Local 175, defendant.

*Frank M. Abbate* for Carl Hacker and another, defendants.

HALPERN, J. This is an action for an injunction against the picketing of the plaintiff's premises. The plaintiff is the owner of a restaurant and tavern at 443 Forest Avenue in the city of Buffalo, New York. The defendant unions, consisting of unions of hotel and restaurant employees, waitresses, cafeteria and dairy lunch workers, and bartenders, and the defendant local joint executive board, composed of and representing the local chapters of the international unions, are engaged in picketing the plaintiff's premises, in an endeavor to unionize the plaintiff's establishment and to induce the plaintiff to enter into a union shop contract. It appeared upon the trial that there is no controversy between the parties with respect to any point other than the plaintiff's employment of three barmaids who perform the functions of bartenders. There is no controversy as to wages, hours, or working conditions. The plaintiff has indicated her willingness to enter into a union shop contract with the defendant unions and to require all her employees to become members of the appropriate unions, and all the employees are apparently willing to become union members. It appears, however, that one of the defendant unions, the Bartenders League of America, does not accept female members, so that the barmaids employed by the plaintiff are not eligible for membership. The other unions covering waitresses and other restaurant employees are willing to admit the plaintiff's other employees into membership. It appears that it has been the national policy of the Bartenders League for many years not to admit women members, although it appears there was some deviation from that policy during the war when a sufficient supply of male bartenders was not available.

The net result of the unions' demand that the plaintiff's establishment be unionized, coupled with the refusal of the Bartenders League to accept barmaids, is to require the plaintiff to discharge the barmaids now in her employ and to replace them with male bartenders.

This demand raises sharply the question of whether a union may lawfully insist upon a closed or union shop while it arbi-

trarily refuses to admit into its membership certain of the present employees of the establishment sought to be unionized. It is clear, upon the authorities in this State, that the answer to this question must be in the negative. The law on this subject is of comparatively recent development. It is, to a large extent, still in a state of flux, but the case of *Clark* v. *Curtis* (273 App. Div. 797, affd. 297 N. Y. 1014) establishes the proposition that a closed union may not lawfully demand a closed shop, at least, to the extent that it may not demand that the employer discharge his present employees on the ground that they are not members of the union when, in fact, the employees are willing to join the union but the union arbitrarily denies them admission.

It was settled long ago in New York State that a closed shop is lawful and that a union may strike, maintain a picket line, or take other appropriate action to compel the employer to agree to a closed shop (*National Protective Assn.* v. *Cumming*, 170 N. Y. 315; *Williams* v. *Quill*, 277 N. Y. 1). It may also be assumed for the purpose of this decision that it is the settled law of this State that a union is free to select its own members and, with or without reason, to refuse to admit applicants for membership (except that, under section 43 of the Civil Rights Law, a union may not deny membership on the ground of race, creed, color or national origin). " It has been the law in this State for many years that a union cannot be compelled to admit strangers to membership (*McKane* v. *Adams*, 123 N. Y. 609; *Murphy* v. *Higgins*, 12 N. Y. S. 2d 913, affd. 260 App. Div. 854; *Matter of Miller* v. *Ruehl*, 166 Misc. 479; *Acierno* v. *North Shore Bus Co.*, 173 Misc. 79, 81; *Shein* v. *Rose*, 12 N. Y. S. 2d 87)." (*Ryan* v. *Simons*, 98 N. Y. S. 2d 243, revd. on other grounds 277 App. Div. 1000.)

However, when these two propositions are brought together and a union, which has exercised its right to close its membership against certain employees or a class of employees, demands that the employer enter into a closed or union shop contract under which only union members may be retained in employment, an obviously inequitable situation results. The problem was resolved in *Clark* v. *Curtis* (*supra*) by holding that the union, under such circumstances, would be required to accept one of two alternatives: either it would have to admit the employees to membership in the union, or it would have to exempt them from the requirement of union membership as a condition of continued employment under the proposed contract with the employer. In the brief filed by the American Civil

Liberties Union as *amicus curiæ* in *Clark* v. *Curtis*, the Court of Appeals was asked to go further and to abrogate the rule, laid down in the decisions cited above, that a union has the right arbitrarily to refuse admission to membership. The Court of Appeals declined to do this and simply affirmed without opinion the decision of the Appellate Division, which upheld the sufficiency of a complaint designed to compel the union to choose one of the alternatives set forth above.

*Clark* v. *Curtis* was followed in *Ryan* v. *Simons* (98 N. Y. S. 2d 243, revd. on other grounds 277 App. Div. 1000, *supra*).

There are two bases upon which the holding in *Clark* v. *Curtis* may be said to rest, one growing out of statutory provisions, and the other founded on common-law principles. The statutory basis, which is the ground upon which the Appellate Division rested its decision, is found in the State Labor Relations Act (Labor Law, §§ 700–716). Under subdivision 1 of section 705 of the act, a union which has been designated or selected as the representative of the employees becomes the exclusive bargaining agent of all of the employees in the appropriate unit, whether they are members of the union or not. Having assumed the statutory responsibility of representing all the employees, the union must represent them fairly, and it may not discriminate against employees who are not members of the union. Clearly, it would be a violation of the fiduciary obligation owing by the union to the nonunion employees whom it represents, to compel their discharge without justification. This doctrine was first laid down by the United States Supreme Court in several decisions dealing with the construction of analogous provisions of the Railway Labor Act and the National Labor Relations Act (*Steele* v. *Lousiville & Nashville R. R. Co.*, 323 U. S. 192; *Tunstall* v. *Brotherhood of Locomotive Firemen & Enginemen*, 323 U. S. 210; *Graham* v. *Brotherhood of Locomotive Firemen & Enginemen*, 338 U. S. 232; *Wallace Corp.* v. *National Labor Relations Bd.*, 323 U. S. 248).

Cf. *Betts* v. *Easley* (161 Kan. 459) in which the court went beyond the Supreme Court decisions and held that a labor union, which acts as exclusive statutory bargaining agent, must admit negro employees to full membership with privileges equal to those accorded to white employees.

In the answer of the defendants Hacker and Geracci, the unions assert that they represent a majority of the plaintiff's employees and that they constitute the exclusive bargaining agent of all the plaintiff's employees. While the unions have not been so designated by election, pursuant to the provisions

of the State Labor Relations Act, they have been apparently accepted as the exclusive bargaining agent by the plaintiff's employees and, for the present purposes, the allegations of the defendants' answer must be assumed to be correct. The principle of the cases cited is, therefore, applicable here. It would be a breach of the fiduciary obligation which the unions owe to their principals, the plaintiff's employees, to compel the plaintiff without justification to discharge some of her employees.

The other basis for the holding in *Clark* v. *Curtis* (*supra*) may be found in the common-law principle, sometimes referred to as the prima facie tort theory, to the effect that one who intentionally inflicts injury upon another is liable therefor unless he justifies or excuses his conduct (*Advance Music Corp.* v. *American Tobacco Co.,* 296 N. Y. 79; *Rochetti & Panzini Corp.* v. *Campo,* 301 N. Y. 228). Under this principle, a union is liable in damages to an employee whom it has arbitrarily refused to admit to membership, if it causes the employee to be discharged under a closed or union shop contract, because of his nonmembership in the union.

The rule is formulated in the Restatement of Torts (§ 810) as follows: " Workers who in concert procure the dismissal of an employee because he is not a member of a labor union satisfactory to the workers are, except as stated in § 811, liable to the employee if, but only if, he desires to be a member of the labor union but membership is not open to him on reasonable terms."

Comment *b* adds: " Whether the terms are reasonable is a question of fact in each case."

See the following decisions of the courts of other States in accord with this principle: *Wills* v. *Local No. 106, Hotel & Restaurant Employees International Alliance* (26 Ohio Nisi Prius [N. S.] 435); *Dorrington* v. *Manning* (135 Pa. Superior Ct. 194); *Shinsky* v. *O'Neil* (232 Mass. 99, 104); *Schwab* v. *Motion Picture Operators' Union* (165 Ore. 602); *James* v. *Marinship Corp.* (25 Cal. 2d 721, note 160 A. L. R. 918 on " Closed Shops and Closed Unions "); *Thompson* v. *Moore Drydock Co.* (27 Cal. 2d 595); *Williams* v. *International Brotherhood of Boilermakers* (27 Cal. 2d 586); *Wilson* v. *Newspaper & Mail Deliverers' Union* (123 N. J. Eq. 347); *Carroll* v. *Local No. 269* (133 N. J. Eq. 144). See, also, Bernhardt, " The Right to a Job " (30 Corn. L. Q. 292); Murray, " Right to Equal Opportunity in Employment " (33 Calif. L. Rev. 388), and Summers, " The Right to Join a Union " (47 Col. L. Rev. 33).

It is clear under the authorities cited that if the defendant unions had arbitrarily refused to admit any designated employee or employees of the plaintiff to membership and at the same time had demanded their discharge because of non-membership, this would have constituted unlawful conduct, for which the unions might be held liable in damages and against which, in an appropriate case, an injunction might issue.

It is equally clear that if the unions had arbitrarily discriminated against a class of employees because of prejudice, dislike, ill will or other illegitimate consideration, an injunction would properly issue against the action of the unions.

The question presented in this case, however, is not so simple. The bartenders' union contends that it is not acting arbitrarily or out of prejudice or malice in excluding women as a class from membership, and in seeking to exclude them from the occupation of bartending, but that, in adopting and enforcing this policy, the union is attempting in good faith to serve its own economic interests.

The union thus invokes the doctrine which is now well settled in this State that the advancement of the union's economic interests is a good justification for union activity, even though the activity may cause injury to others.

" The justification of economic self-interest first recognized in the field of business competition is now recognized to be equally applicable to the activities of labor organizations. Thus, it is now well settled, at least in this state, that, apart from statutory restrictions, a union may demand and strike for a closed shop and may engage in other activities designed to strengthen its bargaining position and to improve wages, hours, and working conditions and that it is not liable for incidental damage caused to others as a result of its activities in pursuit of such lawful labor objectives." (*Barile* v. *Fisher,* 197 Misc. 493, 497.)

However, the means used to advance the economic interests of the union must be legitimate ones. As the Court of Appeals has said: " The justification that is required in a case like this must, of course, be one which the law will recognize." (*Advance Music Corp.* v. *American Tobacco Co.,* 296 N. Y. 79, 85, *supra.*)

The exclusion of women obviously serves the economic interests of the union in reducing the number of persons competing for jobs as bartenders but, concededly, an exclusion for this purpose cannot be recognized as legitimate. The creation of an artificial scarcity of available workers is clearly not a legitimate labor objective.

The union argues, however, that its economic interests are involved in another way. It claims that, if women are admitted, there will be an inevitable tendency to lower the prevailing wage scale of bartenders. There is no showing that there is such a risk in the present case, the plaintiff having expressed her willingness to pay full union scale to the barmaids. Furthermore, section 199-a of the Labor Law, guaranteeing equal pay for equal work for men and women, would seem to stand in the way of a development such as the union fears. But even if it were assumed that the widespread employment of women in bartending might ultimately result in a lower standard of pay, this cannot be accepted as a legitimate ground for the exclusion of women. The union may not insist upon a monopoly for the members of a particular class in society on the ground that that class is likely to command higher pay in the labor market than the classes which it seeks to exclude. The union must rely upon its bargaining strength, and, where available, the invoking of such statutory safeguards as the equal pay provision, to resist any downward trend which may result from the admission of persons of different color, nationality or sex.

This brings us to the principal justification offered by the union, the claim that the employment of barmaids is likely to give rise to evils which may bring discredit upon the whole liquor vending industry and ultimately result in the return of prohibition or the imposition of restrictions which would eliminate or seriously reduce the opportunities for employment now available to the union's members. This claim is based upon the contention that the employment of barmaids will lead to practices contrary to good morals and public welfare.

Insofar as this contention relates to the welfare of the community in general rather than to the special interest of the union in the economic future of the liquor industry, it may not be availed of by the union as justification for its policy. The union is not the guardian of public morals. If exclusion of women from bartending is thought to be desirable or necessary in the public interest, that is a matter to be presented to and passed upon by State or local legislative bodies. It is not a matter within the province of legitimate union activity. So long as the State or municipality has not decided upon an occupational exclusion, a union may not, by its private action, establish a rule of exclusion on the ground that it is serving the general public interest.

However, insofar as the argument advanced by the union is intended to relate to the special interest of the union in the economic future of the liquor industry, its contention is entitled to consideration.

The union makes two major claims with respect to the effect of the employment of women upon the reputation of the liquor dispensing business: (1) It argues that barmaids are likely to engage in loose or immoral conduct; that they may exploit their sex appeal in order to promote the sale of liquor; they may solicit drinks for themselves and encourage the purchase of drinks by their customers under illegal commission or profit-splitting arrangements with the proprietor; (2) It argues that barmaids may fail to enforce liquor regulations effectively; they are said to "lack authority" in enforcing restrictions against the sale of liquor to minors or to persons who are intoxicated or apparently under the influence of liquor; it is claimed that they do not have the physical strength and moral force to maintain order as effectively as male bartenders.

Certain inconsistencies in the union's argument may be noted at the outset. There seems to be no objection by the union to the service of liquor by women employed as waitresses. The other unions affiliated with the bartenders' union admit to their membership waitresses employed in taverns or restaurants who serve liquor at tables. It is difficult to perceive a greater threat to the fair name of the liquor industry in the service of liquor by a barmaid behind the bar than in the service of liquor by a waitress at a table. During the war years, when bartending was declared a nonessential occupation and bartenders were required to enter the armed services or to obtain employment in war plants, the union acquiesced in the widespread employment of women as bartenders, and there is no proof that any of the evils, which the union now envisages, then resulted.

The plaintiff charges that the union's expression of concern for the good repute of the industry is a mere pretext and that the real motive of the union is the illegitimate creation of a monopoly for male bartenders and the promotion of their immediate economic interests in a way which is concededly unlawful.

Without inquiring into the motives of the union, I think that it is enough to say there has been no showing, either by the evidence introduced upon the trial or by the matters of which the court was asked to take judicial notice, that the employment of women would create any substantial risk of discredit to the industry. There has been no demonstration that there is any greater risk of barmaids stepping out of their legitimate roles

and becoming illicit solicitors of drinks than there is of waitresses or other female employees engaging in similar illegal practices. In any event, there has been no showing that the licensing authorities and the local police are not capable of coping with any evil which may develop. It should be noted that there is no claim by the defendant unions that the barmaids now employed by the plaintiff are not of good moral character or that they ever engaged in improper practices. So far as the general conduct of taverns is concerned, it may be noted that the police lieutenant, called as a witness by the union, testified that there are well-run taverns in which liquor is dispensed by women, and badly-run taverns in which liquor is dispensed by men, and vice versa. He was unable to find any basis for a generalization that the employment of women as bartenders adversely affected the conduct of taverns.

The regulation of the conduct of taverns is peculiarly within the province of the New York State Liquor Authority. It is significant that the Authority, which is vested with licensing and rulemaking power in the regulation of the liquor vending industry, has not raised any objection to the employment of barmaids, and has not adopted any rule forbidding their employment.

In any event, even if it were made to appear that in some instances the employment of female bartenders had been injurious to the reputation of the liquor vending industry, this would not justify wholesale discrimination against women as a class. The legitimate interest of the union in the good reputation of the liquor industry can be adequately protected by a process of individual selection and exclusion. The union may reject or expel any female bartender who appears to be of bad moral character or who is found to have engaged in improper practices, just as it may exclude a male bartender on similar personal grounds. To go beyond this and condemn women as a class, upon the ground that they are likely to bring the industry into disrepute, seems to me to be arbitrary and unreasonable.

Discrimination on the ground of sex, in the absence of any evidence of incompetence or bad moral character in the particular case, must be condemned as a violation of the fundamental principles of American democracy. The right to be free from discrimination on class grounds is one of our fundamental freedoms. It is true that the statute prohibiting discrimination by labor unions (Civil Rights Law, § 43) does not enumerate sex as one of the forbidden grounds of discrimi-

nation, and it is likewise true that the other statutes in this State, aimed at the elimination of discrimination, do not in terms forbid discrimination on the ground of sex (e.g. Executive Law, §§ 125–136). However, the principle against discrimination is not limited to the instances covered by the particular statutory provisions. Those statutes merely provide special penalties or special procedures against discrimination. Under the present New York statutes, the special penalties or procedures cannot be invoked against discrimination on the ground of sex, but it does not follow that a court may not condemn such discrimination as a violation of fundamental principles and judge the legitimacy of union activities in the light of such principle.

Indicative of the spirit of our times are the provisions of the Universal Declaration of Human Rights, adopted in 1948 at the Third Session of the General Assembly of the United Nations without dissenting vote.

Article 2 of the Declaration provides: '' Everyone is entitled to all the rights and freedoms set forth in this Declaration, without distinction of any kind, such as race, color, sex, language, religion, political or other opinion, national or social origin, property, birth or other status.''

Article 23 provides: '' Everyone has the right to work, to free choice of employment, to just and favourable conditions of work and to protection against unemployment.''

The argument that the wholesale exclusion of women from bartending is a legitimate and justifiable means of protecting the interest of the union in the good reputation of the liquor industry must therefore be rejected.

The union makes a subsidiary argument that the employment of women as bartenders is likely to be injurious to the women themselves; that they may be required to do heavy lifting beyond their physical strength and that they may be subjected to offensive conduct on the part of intoxicated customers with whom they may not be able to cope and from whose presence they may not be able to escape easily because of the requirement that they remain in a more or less stationary position behind the bar. There has been no demonstration that this presents a serious or insuperable difficulty. There are no physical risks connected with the work which cannot be avoided by suitable arrangements for the assistance of a porter or barboy to do the heavy lifting or any other incidental work beyond the physical capacity of a woman. There is nothing to show that the bar-

maids presently employed by the plaintiff have been unable to handle the work or that they have been subjected to any risk of injury. The other risk referred to by the union, the risk of offensive conduct on the part of customers, hardly justifies the union policy of exclusion. While there is some difference in the ability to walk away from an offensive customer, as between a waitress serving liquor at a table and a barmaid dispensing it across a bar, the difference is hardly so great as to justify a union policy excluding women from bartending while allowing them to serve liquor as waitresses.

The union's argument, based upon an alleged tradition limiting bartending to men, does not merit serious consideration. It is suggested by the plaintiff that the tradition is one of the union's own making, and that the small percentage of women now engaged in the occupation is due to the long-continued enforcement of the union's policy. The plaintiff points to a contrary tradition in England and in colonial America, which antedated the establishment of the union's policy; in earlier times, dispensing of liquor was largely in the hands of barmaids, whose activities are recorded in many literary works, including the plays of Shakespeare and the works of many authors before and after his time. Whatever the source of the tradition now exalted by the union may be, it can hardly be accepted as a justification for an occupational exclusion in the twentieth century, in view of the excellent service rendered by women during recent decades in many and varied occupations which were traditionally considered to be open to men only. It may also be noted that, for good or for ill, the nature of the patronage of taverns has greatly changed in recent years, and at least a substantial proportion of the patrons are women. If the appeal to tradition ever had any substance, it has been rendered obsolete by the greatly altered social and economic status of women.

The union calls to the court's attention the statutes adopted in many States and the ordinances adopted in many cities forbidding bartending by women and it argues that a determination which has been reached by so many legislative bodies can hardly be condemned as arbitrary and unreasonable when adopted by a union as its policy. This argument has a certain verbal persuasiveness but it overlooks the fundamental difference between a regulatory statute, adopted by a Legislature in the exercise of its police power, and a policy sought to be enforced by a private group. While there can be no doubt as to the constitutionality of the statutory prohibitions against the

employment of barmaids (*Goesaert* v. *Cleary,* 335 U. S. 464), it does not follow that a private group within the community may take action aimed at the same end. The Legislature may act upon the grounds of general public interest. It is vested with broad discretion in the exercise of its sovereign power. What may be reasonable and lawful for a Legislature to do may be unreasonable or arbitrary on the part of a private group. The Legislature represents the whole of the public and not any single group. There is a presumption of the constitutionality of the Legislature's action which can be overcome only by a showing that its action is wholly without rational basis. (*Lincoln Federal Labor Union* v. *Northwestern Iron & Metal Co.,* 335 U. S. 525.) No such presumption attaches to the action of a private group when its action is challenged by a person injuriously affected by it. If the concerted action of a private group causes intentional injury to others, it is prima facie tortious, and in order to excuse the infliction of the injury the group must make an affirmative showing that its social and economic interests justify its action. In view of the conclusion reached above, that the wholesale discrimination against women is not warranted as a legitimate means of protecting the economic interests of the union, the union's action must be condemned as unlawful, even though a statute forbidding the employment of women as bartenders would constitute a valid exercise of the police power of the State.

As a matter of fact, the argument based upon the statutes adopted in other States cuts against the defendants' position. In those States, the State Legislature has determined that it is in the interest of the public to exclude women from the occupation of bartending. In New York State, no such determination has been made, either by the State or local legislative bodies, or by the administrative agency charged with the supervision of the liquor industry.* It is therefore the public policy of this State that bartending is an occupation which is lawfully open to women. The public policy of the State is that declared by the Legislature or by the courts and not that adopted by any

---

* Every year from 1942 to 1950 inclusive, there was introduced in the New York State Legislature a bill amending section 106 of the Alcoholic Beverage Control Law to provide that: "No retail licensee for on-premises consumption shall employ, suffer or permit any female, other than the licensee or the wife of the licensee, to draw, pour, or mix any alcoholic beverage, or to attend any bar, as an employee of said licensee." (See Assem. Int. & Pr. No. 561, 1950 Sess.) In each instance, the bill was referred to the Excise Committee where it died.

private group. (*Mertz* v. *Mertz*, 271 N. Y. 466, 472.) The discriminatory policy adopted by the defendant union flies in the face of the public policy of the State.

The case has been discussed up to this point as one in which the union was seeking for the first time to obtain a union shop contract covering the plaintiff's establishment.

It appears, however, that a contract had been entered into between the plaintiff's husband and the defendant unions, acting through the local joint board, prior to the commencement of this action. The contract was repudiated by the plaintiff on the ground that her husband had no authority to enter into it, and the picketing of the plaintiff's establishment, which had been suspended during the period of the contract negotiations, was thereupon resumed. It appears that the plaintiff's husband had represented himself to be the owner of the establishment and that it was not until a short time prior to the commencement of this action that the unions were advised that the establishment was owned by the plaintiff rather than by her husband.

The husband's authority to enter into the contract on behalf of the plaintiff was extensively litigated upon the trial. A question also arose as to whether the contract had not been entered into as the result of misrepresentation or mutual mistake. I have come to the conclusion that there is no need to pass upon these questions because, even if it were held that the plaintiff was bound by the contract, the result here reached would not be affected. The union would not be entitled to enforce a provision of a contract, either by action of the courts or by use of its economic weapons, insofar as the provision was found to be unlawful or against public policy. For the reasons already given, the union shop provision of the contract is found to be against public policy, insofar as it requires the employer to discharge present employees whom the union refuses, without justification, to admit into membership. The counterclaim seeking enforcement of this provision of the contract is therefore dismissed.

Only a word need be said about the effect of section 876-a of the Civil Practice Act, upon the right of the plaintiff to obtain injunctive relief against picketing. It is now well settled that section 876-a does not apply where the union engages in picketing to attain an unlawful objective or to enforce an unlawful demand. The Court of Appeals has held that in such a case, the parties are not engaged in a labor dispute within the meaning of section 876-a and that therefore injunctive relief is not

barred by that section. (*Opera on Tour* v. *Weber,* 285 N. Y. 348, certiorari denied 314 U. S. 615; *American Guild of Musical Artists* v. *Petrillo,* 286 N. Y. 226.)

Prior to the decisions of the United States Supreme Court handed down during the 1949–1950 term, it would have been necessary to consider the impact of the First and Fourteenth Amendments of the United States Constitution upon the power of the court to enjoin peaceful picketing. The earlier decisions in the period from 1940 to 1948 had identified peaceful picketing with freedom of speech and had severely limited the power of the State Legislatures and State courts to forbid such picketing. The authority of these decisions has been impaired, if they have not been wholly overruled, by the recent decisions. It is now recognized that picketing is not merely the exercise of the right of freedom of speech; it is recognized that it has a coercive force which goes beyond the effort to persuade by an appeal to reason, and that the use of this economic weapon may be enjoined if the objective, which is sought to be attained by its use, is unlawful under State law. (*Giboney* v. *Empire Stor. & Ice Co.,* 336 U. S. 490; *Building Service Employees Int. Union* v. *Gazzam,* 339 U. S. 532; *Hughes* v. *Superior Court,* 339 U. S. 460; *International Brotherhood of Teamsters* v. *Hanke,* 339 U. S. 470; see, also, Fraenkel, "Peaceful Picketing — Constitutionally Protected?", 99 U. of Pa. L. Rev. 1; Frank, "The United States Supreme Court: 1949–1950," 18 U. of Chi. L. Rev. 1, 6–10.)

It has been assumed by both parties that the plaintiff's business is to be regarded as wholly intrastate and not within the stream of interstate commerce and that, therefore, the National Labor Relations Act as amended by the Labor Management Relations Act of 1947 (U. S. Code, tit. 29, § 141 *et seq.*) is not applicable, and the case has been considered and decided upon that basis. It may be noted that, if the Labor Management Relations Act applied, the conduct of the defendant unions would clearly constitute an unfair labor practice since, under that act, the discharge of an employee may not be sought by a union on the ground that he is not a member of the union unless the union is willing to admit the employee upon the same terms and conditions generally applicable to other members.

The plaintiff is entitled to an injunction enjoining the defendant unions from picketing the plaintiff's establishment in an effort to compel the plaintiff to discharge the barmaids now employed by her. The injunction to be entered herein will forbid the picketing of the plaintiff's establishment by the

defendant unions unless the defendant unions agree, in the alternative, either to admit the barmaids presently employed by the plaintiff into membership in the bartenders' union (subject to reasonable terms and conditions), or to modify their demand for a union shop, so as to exempt the barmaids now employed by the plaintiff from the requirement that all the plaintiff's employees be or become members of the defendant unions.

Submit decree accordingly.