ITALO J. FALCONE, PLAINTIFF-RESPONDENT, v. MIDDLESEX COUNTY MEDICAL SOCIETY, AN UNINCORPORATED ASSOCIATION, AND MIDDLESEX COUNTY MEDICAL SOCIETY, A CORPORATION, DEFENDANTS-APPELLANTS.

Argued February 20, 1961—Decided May 8, 1961.

*Mr. Harry Heher* argued the cause for the appellants (*Messrs. Backes and Backes,* attorneys; *Mr. Robert M. Backes,* of counsel).

*Mr. Robert N. Wilentz* argued the cause for the respondent (*Messrs. Wilentz, Goldman, Spitzer and Sills,* attorneys; *Mr. Frederick K. Becker,* of counsel).

The opinion of the court was delivered by

JACOBS, J.   The Law Division directed that the plaintiff Dr. Falcone be admitted to full membership in the Middlesex County Medical Society; its reasons and supporting authorities are set forth in a comprehensive opinion which is reported in *Falcone v. Middlesex County Medical Soc.,* 62 *N. J. Super.* 184 (*Law Div.* 1960) and is discussed in Note, "Expulsion and Exclusion from Hospital Practice and Organized Medical Societies," 15 *Rutgers L. Rev.* 327 (1961). The County Medical Society appealed from the Law Division's judgment to the Appellate Division and, while the appeal was pending there, we certified it on our own motion.

The Law Division's factual findings are amply supported by the record and need only be dealt with here briefly. After pre-medical study, Dr. Falcone enrolled in the Philadelphia College of Osteopathy.   While there he received a full medical course and in 1946 was awarded the degree of Doctor of Osteopathy (D. O.).   Thereafter he served a one-year internship and a three-year residency at the Detroit Osteopathic Hospital.   He presented his credentials to the New Jersey State Board of Medical Examiners, passed the prescribed medical examination (see *N. J. S. A.* 45:9–15), and in 1950 received a certificate from the State Board which set forth that Italo John Falcone, D. O. had passed examination and "is hereby licensed to practice Medicine and Surgery in the State of New Jersey."   See *N. J. S. A.* 45:9–5.1.   The Philadelphia School is an accredited school of osteopathy and, after a personal inspection, was approved as in good standing by the New Jersey State Board of

Medical Examiners; although the Philadelphia School affords a full traditional medical course as well as osteopathic teaching, it has not been recognized as an approved medical college by the American Medical Association (A. M. A).[1] In November 1951, after seven months' attendance, plus credit for his work at the Philadelphia School, Dr. Falcone graduated from the College of Medicine of the University of Milan with the degree of Doctor of Medicine and Surgery (M. D.). The College of Medicine of the University of Milan was then and still is recognized as an approved medical college by the American Medical Association. Following his graduation from Milan, Dr. Falcone completed a sixteen months' internship at St. Peter's General Hospital in New Brunswick and thereafter he had a short residency in surgery at the Jersey City Medical Center. The St. Peter's internship had the approval of the American Medical Association; the residency at the Jersey City Medical Center had no

[1] The tenuous nature of the American Medical Association's opposition to accredited schools of osteopathy such as the Philadelphia School is indicated by testimony quoted in the Law Division's opinion. See *Falcone v. Middlesex County Medical Soc.*, *supra*, 62 *N. J. Super.*, at *p.* 206. See also Note, "The American Medical Association: Power, Purpose and Politics in Organized Medicine," 63 *Yale L. J.* 938, 966–967 (1954) ; Note, "State Recognition of Doctors of Osteopathy Compared with State Recognition of Doctors of Medicine," 31 *Notre Dame Law.* 286 (1956). *Time Magazine*, in its April 7, 1961 issue, reported that a merger agreement was recently entered into between the California Medical Association and the California Osteopathic Association. The agreement, which is subject to ratification, contains a statement of purposes which sets forth, in part, that by the unification of the Associations, the parties "intend to remove any distinction among the individuals practicing medicine and surgery that is not related to skill and ability, to make available to the public at large efficient and adequate hospital facilities, and to improve the educational facilities available for those persons engaged in the practice of medicine and surgery." The agreement also provides that the parties shall, on a continuing basis, use their best efforts "to remove any distinction between or among persons holding a certificate as physician and surgeon in the State of California and a degree of Doctor of Medicine, where such distinction is based solely upon the ground that any such person previously held or now holds a degree of Doctor of Osteopathy."

such approval and was terminated by Dr. Falcone when he became aware of that fact.

In 1953 Dr. Falcone was admitted as an associate member of the Middlesex County Medical Society. The by-laws of the Society provide that a physician may not be an associate member for more than two years. In 1956 the Society declined to admit Dr. Falcone as an active member, assigning as its reason that he had been "licensed to practice as a Doctor of Osteopathy and, not as a Doctor of Medicine." This reason was unsound since Dr. Falcone's license unrestrictedly authorized him to practice medicine and surgery although it did refer to him as the holder of the degree of D. O. Nothing in the Society's written by-laws purports to preclude membership by a licensed physician who holds an M. D. from an A. M. A. approved medical school (as does Dr. Falcone) but the record does indicate that the Society's committee on medical ethics applies an unwritten membership requirement of four years of study at a medical college approved by the A. M. A. This requirement, if effective, would preclude membership by Dr. Falcone since the A. M. A. has not approved the Philadelphia School and Dr. Falcone's actual attendance at the A. M. A. approved school at Milan was not of the prescribed duration; and it would preclude his membership despite the uncontroverted evidence that he is a duly licensed (*N. J. S. A.* 45:9–1 *et seq.*) and duly registered (*R. S.* 26:11–60) New Jersey physician who meets all of the qualifications prescribed in the written by-laws; that he has consistently practiced surgery and obstetrics and has never practiced osteopathy;[2] that he is regarded by medical colleagues who

---

[2] *Dorland's Illustrated Medical Dictionary* (*23d ed.* 1957) defines osteopathy as "A system of therapy founded by Andrew Taylor Still (1828–1917) and based on the theory that the body is capable of making its own remedies against disease and other toxic conditions when it is in normal structural relationship and has favorable environmental conditions and adequate nutrition. It utilizes generally accepted physical, medicinal, and surgical methods of diagnosis and therapy, while placing chief emphasis on the importance of normal

are members of the Society, as a qualified physician and surgeon; and that he has not engaged in any conduct which would raise any question as to his professional ethics and competency.

The Society's declaration of his ineligibility and its refusal to admit him to membership have had seriously adverse economic and professional effects on Dr. Falcone. He was a member of the medical staffs of the Middlesex General Hospital and St. Peter's General Hospital in New Brunswick but was dropped because they, like other hospitals in the area, require that their staff physicians be members of the County Medical Society. It seems entirely evident that Dr. Falcone cannot successfully continue his practice of surgery and obstetrics or properly serve his surgical and obstetric patients without the use of local hospital facilities; he testified that in order to earn a livelihood it is necessary "to belong to the local society" for "otherwise, you cannot use the hospitals." The virtual monopoly which the Society possesses in fact over the use of local hospital facilities results from the well known interrelationship between the County Society, the State Medical Society, the American Medical Association and the Joint Commission on Accreditation of Hospitals. See *Falcone v. Middlesex County Medical Soc., supra,* 62 *N. J. Super.,* at *p.* 197; Note, *supra,* 15 *Rutgers L. Rev.,* at *p.* 327, n. 2; Comment, "The American Medical Association: Power, Purpose, and Politics in Organized Medicine," 63 *Yale L. J.* 938, 949 (1954); *cf.* Chafee, "The Internal Affairs of Associations Not for Profit,"

---

body mechanics and manipulative methods of detecting and correcting faulty structure." Dr. Falcone testified in effect that his study at the Philadelphia School of Osteopathy was "the study of medicine which includes all of its branches as understood today in addition to the benefits that might be derived by manipulation of certain areas of the spine"; that the "modern day osteopath does not limit his practice to osteopathy" but engages in the general practice of medicine with osteopathy as an additional therapeutic tool; and that since graduation he has not done "any osteopathic manipulation."

43 *Harv. L. Rev.* 993, 1021 (1930); Note, 41 *Minn. L. Rev.* 212 (1957); Note, 5 *Utah L. Rev.* 270 (1956); Note, 22 *U. Chi. L. Rev.* 694 (1955). See also *American Medical Ass'n v. United States, 76 U. S. App. D. C.* 70, 130 *F. 2d* 233, 250, note 87 (*D. C. Cir.* 1942); *Group Health Cooperative of Puget Sound v. King County Medical Soc.*, 39 *Wash. 2d* 586, 237 *P. 2d* 737, 754 (*Sup. Ct.* 1951). Over thirty years ago Professor Chafee, in his discussion of non-profit associations, pointed to the distinction between the customary social and fraternal organizations on the one hand and trade unions and professional societies on the other hand; he noted that whereas exclusion or expulsion from a social or fraternal organization may result in little more than hurt feelings, exclusions or expulsion from a trade union or a professional society may result, as here, in deprivation of the invaluable opportunity "to earn a livelihood." 43 *Harv. L. Rev.*, at *p.* 1022. In a more recent discussion addressed specially to medical societies, the editors of the Yale Law Journal, after pointing out that exclusion or expulsion from a local medical society results, as a practical matter, in the deprivation of hospital facilities, descriptively noted that "non-membership amounts to a partial revocation of licensure to practice medicine." 63 *Yale L. J.*, at *p.* 953.

After the County Society refused to admit him to full membership, Dr. Falcone appealed to the State Medical Society which gave him a hearing but refused to permit representation by legal counsel. The State Society declined to interfere with the County Society's action and on further appeal the American Medical Association took the position that it lacked jurisdiction. Dr. Falcone then instituted his proceeding in the Law Division seeking an order directing the County Society to admit him to membership. The only party named as a defendant was the County Society but no other parties were indispensible and we need not now consider whether others would have been proper parties since the issue was not raised in the Law Division and no move was made there towards joinder of the State Society,

the hospitals, or others as parties. See *Reid v. Medical Society*, 156 *N. Y. S.* 780, 791 (*Sup. Ct.* 1915), affirmed 177 *App. Div.* 939, 163 *N. Y. S.* 1129 (*App. Div.* 1917); *cf.* Note, *supra*, 15 *Rutgers L. Rev.* 327. The County Society's position in the Law Division, repeated in this court, is that it is a voluntary organization which is at liberty to prescribe its own rules and that Dr. Falcone has "no judicially enforceable right of admission to membership." In the Law Division, Judge Vogel determined that, in the light of its virtual monopolistic control of the practice of medicine in the area, the County Society must be dealt with as involuntary in nature and subject to judicial scrutiny; he expressly found that the County Society's requirement of four years' study in a medical college approved by the A. M. A., as applied to Dr. Falcone, "contravenes the public policy of the State" and entered judgment directing that it admit him to full membership. See *Falcone v. Middlesex County Medical Soc., supra*, 62 *N. J. Super.*, at *pp.* 201–202.

Throughout his formative writings, Holmes repeatedly stressed the vital part played by public policy considerations in the never ending growth and development of the common law. Over eighty years have passed since he expressed his now well known thought that "every important principle which is developed by litigation is in fact and at bottom the result of more or less definitely understood views of public policy." See Holmes, "Common Carriers and the Common Law," 13 *Am. L. Rev.* 609, 631 (1879); *Holmes, The Common Law* 35 (1881). And while earlier day judges displayed hesitancy in its acknowledgment, modern day judges display no comparable hesitancy; in recent decisions our courts have repeatedly acknowledged that public policy is the dominant factor in the molding and remolding of common law principles to the high end that they may soundly serve the public welfare and the true interests of justice. See *Collopy v. Newark Eye and Ear Infirmary*, 27 *N. J.* 29 (1958); *Faber v. Creswick*, 31 *N. J.* 234 (1959);

*Smith v. Brennan,* 31 *N. J.* 353 (1960); *Henningsen v. Bloomfield Motors, Inc.,* 32 *N. J.* 358 (1960); *cf.* Stone, "The Common Law in the United States," 50 *Harv. L. Rev.* 4, 20 (1936); *Cardozo, The Nature of the Judicial Process* 10 (1921). See also *A. P. Smith Mfg. Co. v. Barlow,* 13 *N. J.* 145, 154 (1953).

Courts have been understandably reluctant to interfere with the internal affairs of membership associations and their reluctance has ordinarily promoted the health of society. See *Chafee, supra,* 43 *Harv. L. Rev.,* at *p.* 1027; Note, *supra,* 15 *Rutgers L. Rev.,* at *p.* 329. Nevertheless, in particular situations, where the considerations of policy and justice were sufficiently compelling, judicial scrutiny and relief were not found wanting; for the most part these situations involved improper expulsions from pre-existing membership which called forth judicial directions for reinstatement or other suitable relief. See *Sibley, Board of Management of v. Carteret Club of City of Elizabeth,* 40 *N. J. L.* 295 *(Sup. Ct.* 1878); *Vivar v. Supreme Lodge of Knights of Pythias,* 52 *N. J. L.* 455, 461 *(Sup. Ct.* 1890); *cf. Spayd v. Ringing Rock Lodge No.* 665, 270 *Pa.* 67, 113 *A.* 70, 14 *A. L. R.* 1443 *(Sup. Ct.* 1921); *Reid v. Medical Society, supra,* 156 *N. Y. S.* 780; *State ex rel. Waring v. Georgia Medical Society,* 38 *Ga.* 608, 95 *Am. Dec.* 408 *(Sup. Ct.* 1869); *Bernstein v. Alameda-Contra Costa Medical Ass'n,* 139 *Cal. App.* 2d 241, 293 *P.* 2d 862 *(Ct. App.* 1956); Annotation, "Suspension or expulsion from professional associations and the remedies therefor," 20 *A. L. R.* 2d 531, 539, 547 (1951); Annotation, "Jurisdiction of equity to protect personal rights; modern view," 175 *A. L. R.* 438, 506 (1948). In granting relief courts have, on various occasions, discussed specific legal theories resting on protection of the member's property interests, his contractual rights, and his advantageous relationships with the association; on other occasions they have, without discussion of specific legal theories, set aside the expulsion as being unreasonable, contrary to natural justice or violative

of public policy. See Cox, "The Role of Law in Preserving Union Democracy," 72 *Harv. L. Rev.* 609, 613 (1959); Chafee, *supra*, 43 *Harv. L. Rev.* 1004; Note, "Protection of Membership in Voluntary Associations," 37 *Yale L. J.* 368, 372 (1928); *cf. Lee v. The Showmen's Guild of Great Britain*, 2 *Q. B.* 329, 342 (1952); *Joseph v. Passaic Hospital Ass'n*, 26 *N. J.* 557, 569 (1958); Note, "Unreasonableness and the Rules of Voluntary Associations," 2 *Vict. U. C. L. Rev.* 68 (1956). In *Bernstein v. Alameda-Contra Costa Medical Ass'n*, *supra*, 293 *P.* 2d 862, 865, the court noted that any medical association's by-law which is found by the court to be against public policy is unenforceable and furnishes no legal support for an expulsion. See 5 *Utah L. Rev.* 270 (1956); 41 *Minn. L. Rev.* 212 (1957). It cited many supporting authorities including *Spayd v. Ringing Rock Lodge No. 665*, *supra*, 270 *Pa.* 67, 113 *A.* 70, where the Pennsylvania Supreme Court sustained a lower court order restoring the plaintiff to membership in a labor union from which he had been expelled because he had petitioned the legislature for the repeal of a law which his union favored. See *People ex rel. Gray v. Medical Society of County of Erie*, 24 *Barb.* 570, 577 (*N. Y. Sup. Ct.* 1857); *Reid v. Medical Society*, *supra*, 156 *N. Y. S.*, at *p.* 783.

In *Trautwein v. Harbourt*, 40 *N. J. Super.* 247, 59 *A. L. R.* 2d 1274 (*App. Div.* 1956), certification denied, 22 *N. J.* 220 (1956), the court recently dealt with an action for damages by plaintiffs who alleged that they were maliciously denied admission to membership in the Order of the Eastern Star, a fraternal organization of New Jersey. In rejecting the plaintiffs' claim for relief the court (see 40 *N. J. Super.*, at *pp.* 264–265) differentiated the expulsion cases and distinguished exclusion cases involving organizations "membership in which is an economic necessity" or "those which are repositories of civic, civil or political rights." See *Smith v. Allwright*, 321 *U. S.* 649, 64 *S. Ct.* 757, 88 *L. Ed.* 987 (1944). We are here in nowise concerned with a social or fraternal organization such as the Order

of the Eastern Star. We are here concerned with and therefore deal solely with an organization, membership in which may here, in the language of *Trautwein,* be viewed as "an economic necessity"; in dealing with such an organization, the court must be particularly alert to the need for truly protecting the public welfare and advancing the interests of justice by reasonably safeguarding the individual's opportunity for earning a livelihood while not impairing the proper standards and objectives of the organization. See *People ex rel. Bartlett v. Medical Society of County of Erie,* 32 *N. Y.* 187 (*Ct. App.* 1865); *Group Health Cooperative of Puget Sound v. King County Medical Soc., supra,* 39 *Wash. 2d* 586, 237 *P. 2d* 737 (*Sup. Ct.* 1951); *James v. Marinship Corporation,* 25 *Cal. 2d* 721, 155 *P. 2d* 329, 336, 160 *A. L. R.* 900 (*Sup. Ct.* 1944); *Wilson v. Newspaper, etc., Union,* 123 *N. J. Eq.* 347, 351 (*Ch.* 1938); *Carroll v. Local No. 269, etc., Electrical Workers,* 133 *N. J. Eq.* 144, 147 (*Ch.* 1943); cf. *Collins v. International, etc., U. S. and Canada,* 119 *N. J. Eq.* 230, 237 (*Ch.* 1935); Summers, "The Right to Join a Union," 47 *Colum. L. Rev.* 33, 55, 61 (1947); Cox, *supra,* 72 *Harv. L. Rev.,* at *p.* 619.

In *People ex rel. Bartlett v. Medical Society of County of Erie, supra,* the plaintiff was a duly licensed physician of the State of New York and sought to become a member, as he was obliged to under the New York statutes, of the County Medical Society. Although he possessed the qualifications prescribed by the Society's written by-laws, he was denied admission on the ground that he had advertised his claim to peculiar skill in the treatment of certain diseases, contrary to ethical principles announced by the American Medical Association and adopted by the County Society. The plaintiff had discontinued the advertisements prior to his application for membership in the Society. The New York Court of Appeals found that the discontinued advertisements were not sufficient ground for his exclusion and affirmed the lower court's order which had directed that

the plaintiff be admitted to full membership in the Society. See 32 *N. Y.*, at *pp.* 194, 196. See also *Hillery v. Pedic. Soc. of State of New York*, 189 *App. Div.* 766, 179 *N. Y. S.* 62 (*App. Div.* 1919); *Falcone v. Middlesex County Medical Soc., supra,* 62 *N. J. Super.,* at *pp.* 193–194; 15 *Rutgers L. Rev., supra,* at *pp.* 336–337; *cf. Ewald v. Medical Society of New York County,* 144 *App. Div.* 82, 128 *N. Y. S.* 886, 891 (*App. Div.* 1911). In *Group Health Cooperative of Puget Sound v. King County Medical Soc., supra,* the plaintiffs were duly licensed physicians who practiced contract medicine as participants in a prepaid medical cooperative; because of this they were excluded from the County Medical Society and the hospitals in the area. They brought an action under the state's anti-monopoly provisions and were awarded judicial relief which included an order enjoining the County Medical Society from excluding them from membership because they were practicing contract medicine as participants in the prepaid medical cooperative. See 237 *P. 2d,* at *p.* 778; 15 *Rutgers L. Rev., supra,* at *p.* 347; 63 *Yale L. J., supra,* at *pp.* 1018–1021; *cf. Tatkin v. Superior Court,* 160 *Cal. App. 2d* 745, 326 *P. 2d* 201, 206–208 (*Ct. App.* 1958).

In *James v. Marinship Corporation, supra,* the California Supreme Court sustained an order which restrained interference with the employment of the plaintiff where the union had a closed shop agreement with his employer but declined to admit the plaintiff to membership in the union because he was a Negro; in the course of his opinion for the court, Chief Justice Gibson expressed the following views which have pertinence here:

"Where a union has, as in this case, attained a monopoly of the supply of labor by means of closed shop agreements and other forms of collective labor action, such a union occupies a quasi public position similar to that of a public service business and it has certain corresponding obligations. It may no longer claim the same freedom from legal restraint enjoyed by golf clubs or fraternal associations. Its asserted right to choose its own members does not merely relate to social relations; it affects the fundamental right

to work for a living. See *Newman, The Closed Union and the Right to Work* (1943), 43 *Col. L. Rev.* 42, 44; *Northrup, Organized Labor and the Negro* (1944), 238–239; *Chaffee, The Internal Affairs of Associations* (1930), 43 *Harv. L. Rev.* 993, 1021–1023; *Mintz, Trade Union Abuses* (1932), 6 *St. John's L. Rev.* 272, 274–276; (1941) 40 *Mich. L. Rev.* 310." 155 *P.* 2d, at *p.* 335.

See *Williams v. International Brotherhood, etc.,* 27 *Cal.* 2d 586, 165 *P.* 2d 903, 906 (*Sup. Ct.* 1946); *Betts v. Easley,* 161 *Kan.* 459, 169 *P.* 2d 831 (*Sup. Ct.* 1946); Blumrosen, "Legal Protection Against Exclusion from Union Activities," 22 *Ohio St. L. J.* 21, 23 (1961); *cf. Berle, The 20th Century Capitalist Revolution* 82, 103 (1954).

Elsewhere in his opinion in *James,* Chief Justice Gibson referred to various authorities, including the New Jersey decisions in *Wilson v. Newspaper, etc., Union, supra,* and *Carroll v. Local No. 269, etc., Electrical Workers, supra,* as indicating that a court may restrict the arbitrary exclusion of an employee from a union which exercises a monopoly, on the ground that such conduct by the union is "tortious and contrary to public policy." See 155 *P.* 2d, at *p.* 337; *cf. Blumrosen, supra,* 22 *Ohio St. L. J.,* at *pp.* 23, 24; Cox, *supra,* 72 *Harv. L. Rev.,* at *pp.* 614, 619. In the *Wilson* case, *supra,* Vice Chancellor Bigelow suggested that where a union has a virtual monopoly it is under a fiduciary duty not to exercise its power in an arbitrary or unreasonable manner and he referred to Professor Wyman's thesis that the duty of serving all comers on reasonable terms, which was early imposed by the common law on innkeepers, carriers, farriers, and the like, was grounded upon their then virtual monopolies. See Wyman, "The Law of the Public Callings as a Solution of the Trust Problem," 17 *Harv. L. Rev.* 156 (1904); but *cf.* Burdick, "The Origin of the Peculiar Duties of Public Service Companies," 11 *Colum. L. Rev.* 514 (1911). The Vice Chancellor noted that "the union must either surrender its monopoly or else admit to membership all qualified persons who desire to carry on the trade." See 123 *N. J. Eq.,* at

*p.* 351. See also *Wilson v. Hacker,* 200 *Misc.* 124, 101 *N. Y. S.* 2d 461, 468 (*Sup. Ct.* 1950); *Seligman v. Toledo Moving Pictures Operators Union,* 88 *Ohio App.* 137, 98 *N. E.* 2d 54, 59 (*Ct. App.* 1947); *Schwab v. Moving Picture Mach. Operators Local, etc.,* 165 *Or.* 602, 109 *P.* 2d 600, 608 (*Sup. Ct.* 1941).

In the *Carroll* case, *supra,* Vice Chancellor Jayne, after referring to the right of earning a livelihood as a property right guaranteed under the federal and state constitutions, summarized the earlier New Jersey cases as holding that although a monopoly of labor opportunity was a permissible objective "unions obtaining such monopolies must be democratic and admit to their membership all those reasonably qualified for their trade." See 133 *N. J. Eq.,* at *p.* 147. In *Cameron v. International, etc., Union No.* 384, 118 *N. J. Eq.* 11 (*E. & A.* 1935), a union had admitted certain members as juniors with no voice in the affairs of the union and without real opportunity of becoming seniors; the classification was held to be contrary to public policy and the union was ordered to admit the juniors to full membership. See *Collins v. International, etc., U. S. and Canada, supra,* 119 *N. J. Eq.,* at *p.* 237; *Summers, supra,* 47 *Colum. L. Rev.,* at *pp.* 61–62. In *Thorman v. International Alliance, etc.,* 49 *Cal.* 2d 629, 320 *P.* 2d 494 (*Sup. Ct.* 1958), the plaintiff, an experienced and qualified machine operator, applied for membership in Local 162. His application was rejected because he did not receive a favorable two-thirds vote of the members voting, as required by the Local's constitution, and thereupon a newly admitted journeyman was dispatched to perform the work for which the plaintiff had been regularly employed. Thereafter the plaintiff was employed only intermittently elsewhere and he instituted an action in the California Superior Court which found that he met all "lawful and reasonable requirements for membership" in the union and granted a writ of mandate to compel the plaintiff's admission to full membership. The Superior Court's action was sustained by the California

Supreme Court which noted that the plaintiff's cause of action fell clearly "within the principles announced in *James v. Marinship Corporation, supra,* 25 *Cal.* 2d 721, 155 *P.* 2d 329, and that mandamus is a proper remedy." See 320 *P.* 2d, at *p.* 497; *cf.* Wellington, "Union Democracy and Fair Representation: Federal Responsibility in a Federal System," 67 *Yale L. J.* 1327, 1343 (1958).

The persistent movement of the common law towards satisfying the needs of the times is soundly marked by gradualness. Its step by step process affords the light of continual experience to guide its future course. See *Walker, Inc. v. Borough of Stanhope,* 23 *N. J.* 657, 666 (1957). When courts originally declined to scrutinize admission practices of membership associations they were dealing with social clubs, religious organizations and fraternal associations. Here the policies against judicial intervention were strong and there were no significant countervailing policies. When the courts were later called upon to deal with trade and professional associations exercising virtually monopolistic control, different factors were involved. The intimate personal relationships which pervaded the social, religious and fraternal organizations were hardly in evidence and the individual's opportunity of earning a livelihood and serving society in his chosen trade or profession appeared as the controlling policy consideration. Here there have been persuasive indications, as noted earlier in this opinion, that in a case presenting sufficiently compelling factual and policy considerations, judicial relief will be available to compel admission to membership; we are entirely satisfied, as was Judge Vogel in the Law Division, that Dr. Falcone has presented such a case. See *Falcone v. Middlesex County Medical Soc., supra,* 62 *N. J. Super.* 184.

It must be borne in mind that the County Medical Society is not a private voluntary membership association with which the public has little or no concern. It is an association with which the public is highly concerned and which engages in activities vitally affecting the health and

welfare of the people. It started as an unincorporated association and during the course of the pending proceeding was incorporated under *R. S.* 15:1–1 *et seq.* It is a component part of the State Medical Society which was granted a charter by the Legislature in 1864. See *R. S.* 45:9–56. The Legislature has granted authority to the State Society to confer the degree of Doctor of Medicine although the record suggests that the State Society has never availed itself of this authority (*R. S.* 45:9–57); and the Legislature has provided that certain appointments to the State Board of Medical Examiners shall be made from a list furnished to the Governor by the State Society. See *N. J. S. A.* 45:9–1; *cf. Attorney-General v. Thompson,* 83 *N. J. L.* 57, 60 (*Sup. Ct.* 1912). Through its interrelationships, the County Medical Society possesses, in fact, a virtual monopoly over the use of local hospital facilities. As a result it has power, by excluding Dr. Falcone from membership, to preclude him from successfully continuing in his practice of obstetrics and surgery and to restrict patients who wish to engage him as an obstetrician or surgeon in their freedom of choice of physicians. Public policy strongly dictates that this power should not be unbridled but should be viewed judicially as a fiduciary power to be exercised in reasonable and lawful manner for the advancement of the interests of the medical profession and the public generally; the evidence firmly displays that here it was not so exercised and that Dr. Falcone was fairly and justly entitled to the relief awarded to him in the Law Division.

█ The doctrinal controversy between the American Medical Association and the American Osteopathic Association need not detain us since the record establishes that Dr. Falcone received a full medical course along with the degree of D. O. at the Philadelphia School, received the degree of M. D. from the College of Medicine of the University of Milan (an A. M. A. accredited medical school), received an unrestricted license to practice medicine and surgery from the New Jersey State Board of Medical Ex-

aminers after passing the prescribed examination, completed internships at the Detroit Osteopathic Hospital and St. Peter's General Hospital (the latter being approved by the A. M. A.), consistently practiced surgery and obstetrics but not osteopathy, is regarded by his medical colleagues as a qualified physician and surgeon, and has not engaged in any conduct which would raise any question as to his ethics and competency as a member of the medical profession. In the light of all of the foregoing, the effort of the County Society to apply its unwritten requirement of four years' attendance at an A. M. A. approved medical college so as to exclude Dr. Falcone from membership, must be viewed as patently arbitrary and unreasonable and beyond the pale of the law. When the County Society engages in action which is designed to advance medical science or elevate professional standards, it should and will be sympathetically supported. When, however, as here, its action has no relation to the advancement of medical science or the elevation of professional standards but runs strongly counter to the public policy of our State and the true interests of justice, it should and will be stricken down. The judgment entered in the Law Division is in all respects:

Affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, HALL, SCHETTINO and HANEMAN—6.

*For reversal*—None.