[Civ. No. 21818.   First Dist., Div. One.   Sept. 30, 1965.]

BERTRAM KRONEN, Plaintiff and Appellant, v. PACIFIC COAST SOCIETY OF ORTHODONTISTS et al., Defendants and Respondents.

290

Peter Behr, Edward J. Boessenecker and Behr, Boessenecker, Colangelo & Imlay for Plaintiff and Appellant.

Peart, Baraty & Hassard and Alan L. Bonnington for Defendants and Respondents.

SULLIVAN, P. J.—In this action for declaratory and injuntive relief brought by a dentist to secure a determination of his eligibility for active membership in two professional organizations, plaintiff appeals from a judgment denying him all relief against defendants Pacific Coast Society of Orthodontists (P.C.S.O.) and American Association of Orthodontists (A.A.O.) and various individual defendants, members[1] of said society and association.

Plaintiff is a dentist licensed to practice in the states of New York and California. He is 44 years old. He studied dentistry at New York University where he received his D.D.S. degree in 1945. He became licensed in New York and thereupon entered into the general practice of dentistry in that city. Shortly thereafter he commenced postgraduate work in

---

[1]The individual defendants are Philip L. Konigsberg, secretary of the central component of P.C.S.O., and Jack S. Smithers, Donald R. Poulton, Joel N. Gillespie, William S. Smith and George Hahn, constituting the membership committee of said central component.

orthodontics at New York University and in 1950 received a diploma in that specialty. From 1950 to 1952 he continued with the general practice of dentistry, along with some orthodontic work. From 1950 to 1951 he was an associate professor at a dental college. From 1952 to 1956 he was commissioned as an officer in the U. S. Navy, as a member of the dental corps.

Defendant A.A.O. is a Pennsylvania nonprofit corporation and defendant P.C.S.O. is a nonprofit unincorporated association which is a constituent society thereof. Both A.A.O. and P.C.S.O. are professional associations whose membership is composed of dentists specializing exclusively in orthodontics. P.C.S.O. is one of eight constituent societies of A.A.O. organized on a regional basis and, generally speaking, embraces the Western United States, Alaska, Hawaii, the Philippine Islands and the Province of British Columbia. It is subdivided into three component societies along area lines and the central component consists of the membership in northern California, Nevada and Hawaii. The individual defendants are officers or committee members of the central component. (See fn. 1, *ante.*)

After plaintiff passed the California State Board examinations and was separated from active duty, he settled in California to practice as a specialist in orthodontics. He did some orthodontic work at first in San Francisco and Oakland and later in Ukiah and Santa Rosa on a part-time basis. Since August 1957, plaintiff has been continuously and exclusively in the practice of orthodontics in Santa Rosa. This area is within the central component of P.C.S.O. Plaintiff was admitted as an associate member of P.C.S.O. in December 1957.

We set forth in footnotes the pertinent bylaw provisions of A.A.O.[2] and P.C.S.O.[3] as well as other pertinent regulations

---

[2]The bylaws of A.A.O. provide in relevant part as follows:

"Chapter I.   Membership—Active Members:

"Section 2.   Eligibility of Active Members.   (A) A person who is in the exclusive practice of orthodontics [fn. omitted] and who is a member in good standing of his local, state and national dental organizations *may be elected* to membership *through his Constituent Society,* provided the applicant has been: 1. Five years in the exclusive practice of orthodontics, including a successfully completed orthodontic course of a minimum of 1500 hours in an approved dental school.   The applicant *must be recommended by two active members* of the Constituent Society within whose jurisdiction he intends to practice; . . .'' (Italics added.)

"Section 17.   Associate members shall consist of the present Associate members in the Constituent Societies and such members who may

[3]See page 292 for footnote.

of P.C.S.O.[4] dealing with the membership requirements of said associations.

On February 28, 1960, plaintiff filled out an application

be elected to this classification of membership by the Constituent Societies in the future in accordance with the eligibility requirements outlined in CHAPTER XIV—SECTION 8. They shall receive the official publication without cost. They shall have all of the privileges of active members except those of holding office and voting.''

''Chapter XIV. Constituent Societies:

''SECTION 6. The Standards of eligibility for active and associate members in the Constituent Society shall be the same as those in the Association.''

''SECTION 8. SUBSECTION 6. An *Associate member may be elected* by the Constituent and/or component Society *for a maximum of five years.* If during this period he has not qualified for active membership, his Associate membership shall be terminated. Associate membership shall also terminate one year after the Associate member qualifies for active membership.'' (Italics added.)

[3]The bylaws of P.C.S.O. provide in relevant part as follows:

''Chapter I—Membership:

''Section 2. Section A. The minimum qualifications for *active* membership shall be as prescribed by the bylaws of the American Association of Orthodontists, *and, in addition,* the applicant must meet the requirements for *associate membership* in the Pacific Coast Society of Orthodontists. (Italics added.)

''Section B. A dentist may be elected to associate membership in this society provided the applicant has successfully completed: 1. an orthodontic course of a minimum of 1,500 hours in a dental school certified by the A.D.A. Council on Dental Education, or . . . 3. in all cases the training must satisfy the membership committee in the component society, and the *applicant must be recommended by two active members of the component to which he applies.''* (Italics added.)

''Section 3. Election to Membership:

''A. Application for *active* or associate membership shall be made on the form prescribed by the American Association of Orthodontists, and submitted to the secretary of the component in whose jurisdiction the applicant practices, accompanied by the initiation fee and dues of the component, of this society and of the American Association of Orthodontists for the current calendar year. . . .

''C. Approval by the board of directors confers membership upon the applicant, who shall present himself upon notice by his component society to subscribe to the Pledge and the Code of Ethics, and be inducted into this society.''

''Section 7. Termination of Membership:

''C. An associate member upon becoming eligible for active membership shall make application for same. *Associate membership shall automatically terminate one year after eligibility for active membership is reached.''* (Italics added.)

''Chapter V. Duties of Standing Committees:

''Section 12. C. Its members shall investigate the eligibility of applicants in their respective components, and report their recommendations to the component.''

[4]P.C.S.O. adopted certain membership requirements which included *inter alia* the following: ''III. ALL APPLICANTS FOR MEMBERSHIP— College or Associate trained. A. In evaluating the qualifications for membership of any applicant, the Membership Committee of the P.C.S.O.

for active membership in the A.A.O. and the P.C.S.O., its constituent society. His application was endorsed by the same two active members (Drs. Cox and Ballard) who had endorsed his application for associate membership. After waiting several months, he eventually received a letter dated September 26, 1960, from Dr. George Hahn, chairman of the membership committee of P.C.S.O., informing him that his application was to be acted upon by the membership committee at a meeting to be held October 1, 1960. Plaintiff received another letter from Dr. Hahn dated October 5, 1960, advising him that the membership committee of P.C.S.O. was required to satisfy itself that a candidate for active membership "possesses the necessary knowledge and has proven his ability to render competent orthodontic service" before the committee makes its recommendation to the board of directors. In this letter plaintiff was requested to present himself for examination at the next regular membership committee meeting in February 1961 at which time he would be expected to present certain examples of his work and to answer certain examination questions. Plaintiff testified that upon inquiring by telephone of Dr. Hahn why he was being examined and if this would be required of other applicants with graduate orthodontic training, the latter replied that the membership committee had a perfect right to examine him and did not have to explain why.

There was evidence that plaintiff's application for active membership was discussed at a meeting of the membership committee[5] of P.C.S.O. held in San Francisco in October 1960. Drs. Smith and Hahn, the two committee members from the central component of P.C.S.O. (in which plaintiff practices) had reported that there were numerous complaints about plaintiff's personality and competence. The committee felt that it "should take a closer look at this man" and accordingly decided to exercise its function as a "qualifying committee," which usually examines prospective members who have been studying orthodontics as "preceptees" or apprentices,[6] to

*shall satisfy itself that the applicant possesses the necessary knowledge,* both mechanical and biological to render competent orthodontic service." (Italics added.)

[5]This committee was composed of two persons from each of the three components of P.C.S.O.

[6]The A.A.O. and the P.C.S.O. admitted dentists who had not undertaken orthodontic study as a graduate course in a dental college, as plaintiff had, but who had worked with active members for a required number of years in a specified manner, and who submitted themselves to examinations.

ascertain for itself just what plaintiff's qualifications were. Dr. Muchnic, president of P.C.S.O., testified that the committee's action in having plaintiff submit to an examination was taken pursuant to paragraph III of certain membership requirements prescribed by P.C.S.O. (See fn. 4, *ante*.) However, since Drs. Hahn and Smith were the only two members of the committee from the central component (where plaintiff practiced) they felt, out of a sense of responsibility to the committee members representing other areas (see fn. 5, *ante*), that the entire committee should have an opportunity to pass on plaintiff's qualifications.

Plaintiff presented himself for examination by the P.C.S.O. membership committee at the University of California Medical Center in San Francisco on February 25, 1961. In line with the committee's decision the examination was conducted by qualified orthodontists from different areas.[7] Dr. Muchnic testified that plaintiff received the same treatment in his examination as the rest of the applicants being examined at that time. He also testified that it was not necessary to question the applicant on the cases which were exhibited ''because the case records speak for themselves,'' and they were interested in the results rather than the detailed manner in which he accomplished the results. Dr. Hahn testified that the examination was fair. Plaintiff passed the written test but failed the oral and technical part of the examination.

About March 1, 1961, Dr. Hahn informed plaintiff by telephone that he had failed the examination and also advised plaintiff that if he withdrew his application he would not be considered formally or officially as having failed, the matter would not be published in the society's bulletin and plaintiff could apply for active membership at a later time. Dr. Hahn also suggested that plaintiff return to Santa Rosa, improve his competency as an orthodontist, and improve his relations in that community with his patients and fellow practitioners. He informed plaintiff that ''we would give him all of the help that was possible to put him in a position to reapply. . . .'' He also invited plaintiff to call upon him for advice with respect to the treatment of his cases or to watch Dr. Hahn treat his own cases. On March 2, 1961, plaintiff sent a letter to Dr. Hahn withdrawing his application and stating that he ''would like to apply at a future date.'' Despite the incident

---

[7]There were six examiners: Dr. Fraser from Seattle, Dr. Chipman from Spokane, Dr. Hahn from Berkeley, Dr. Smith from Richmond, Dr. Spears from Santa Ana and Dr. Muchnic from Beverly Hills.

of the examination, plaintiff remained an associate member in good standing.

Dr. Hahn testified that subsequently when plaintiff came to his office, he examined plaintiff's cases critically and made suggestions, showed plaintiff his own work, and advised plaintiff generally how to treat people in a profession dealing mainly with children. He stated that plaintiff's knowledge of orthodontics was satisfactory but his application of that knowledge was not and that he was sincerely trying to help plaintiff so that the latter could qualify for admission to the society. He further testified that if plaintiff had improved himself so as to meet the required standards of A.A.O., he himself would have endorsed plaintiff's application. Dr. Smith testified that two other committee members had advised plaintiff to take specifically named refresher courses.

In December 1961 plaintiff made preparations for filing another application for active membership. He obtained a printed form from P.C.S.O. and filled it out except for the endorsements of two members. He had spoken on the matter to Dr. Hahn who told him that he would probably have to submit some cases and reminded him that it was essential to have as endorsers two active members practicing in plaintiff's community. Plaintiff asked Dr. Murray Ballard and Dr. Cox, both of Santa Rosa, to endorse his application as they had his first application. Both men refused to do so when plaintiff told each of them that he would not permit them to come to his office to see his procedures and practice. Dr. Cox told plaintiff that there had been unfavorable reports about plaintiff's work and that plaintiff should allow someone to examine it. Plaintiff then approached Dr. Murray Ballard's brother, Dr. E. W. Ballard, the third of the three orthodontists in Santa Rosa who were active members of P.C.S.O. Dr. E.W. Ballard said that he wouldn't sign plaintiff's application unless he were invited into plaintiff's office to observe plaintiff's work but plaintiff apparently did not agree to such an arrangement. There was testimony by Dr. Hahn that it was customary for associate members to permit other orthodontists to visit their offices and give them professional advice.

Having been unsuccessful in his efforts to obtain the above endorsements, plaintiff obtained the signatures of Dr. Walter Straub and Dr. Berthal Hartman, both active members of P.C.S.O. and A.A.O., the former in practice in San Mateo and

the latter in San Francisco. He thereupon filed the application with P.C.S.O. in January 1962.[8]

Dr. Straub testified that when he signed as a sponsor of plaintiff's application for active membership he did not know plaintiff any more than in a casual way, and that he knew that plaintiff had failed the previous examination and that the active members from Santa Rosa had refused to sponsor his application. Dr. Straub had filled out a questionnaire from Dr. Konigsberg, the secretary of the central component of P.C.S.O. dated February 13, 1962, in which Dr. Straub stated that plaintiff's personal character was of high standing, that plaintiff's professional conduct was ethical, that as far as Straub knew, plaintiff was a capable orthodontist and that he (Straub) felt that plaintiff was better ''in the society than out.'' In the questionnaire, Dr. Straub was careful to state that there was ''some controversy'' about plaintiff's standing with his professional colleagues, that he hoped plaintiff was a worthy applicant; Dr. Straub did not express an opinion based on a visit to plaintiff's office. Dr. Straub testified that it was customary for a sponsor of an applicant to spend a day in the applicant's office and that he had erred in signing plaintiff's application without making such a visit since he was not qualified to say what kind of an orthodontist plaintiff was. He had sponsored plaintiff's application because he knew that plaintiff had a complex about not getting along with people and he felt sorry for him, believing he could help plaintiff get over the ''hump.''

At a meeting of the central component of P.C.S.O. on March 20, 1962, before the membership committee met to act upon the applications pending before it, Dr. Straub withdrew his sponsorship of plaintiff's application. He testified that he did this voluntarily after talking to Drs. Cox and Murray Ballard at the meeting; that he felt that he had made a mistake by not going to plaintiff's office and making more inquiries about him; that he had signed plaintiff's application ''more on a casual basis of acquaintance''; that after talking to Drs. Cox

---

[8]The following appears at the bottom of the application blank immediately below the signature lines for endorsers: ''Note:—Endorsements must be made by members in the locality of the applicant who are members of the Constituent or Component Society where application is being made. Letters of recommendation must be mailed to Constituent Secretary. Constitutional requirements are quoted on reverse side of this blank. All application material must be in the hands of the Secretary not later than 90 days prior to the annual meeting of the Constituent Society.''

and Ballard he "lost all interest" in plaintiff; that he learned from these doctors that plaintiff had been taping telephone conversations and that plaintiff had been having trouble in his community with his professional colleagues and with his patients and their parents; and that plaintiff had not advised him, when obtaining his signature on the application, that plaintiff had refused to permit either Dr. Cox or Dr. Murray Ballard to visit plaintiff's office. Dr. Straub denied that he had been forced to withdraw his endorsement of plaintiff's application because of threats made by two of the membership committee, Dr. Hahn and Dr. Smith, allegedly implying that the admission into active membership of Dr. Straub's own preceptee might be placed in jeopardy. He admitted that in February 1962, a month before the meeting and the withdrawal of his signature, Dr. Smith telephoned him, while he was at Alta skiing, to inquire why he had signed plaintiff's application in view of the fact that he did not practice in the same community and had never visited plaintiff's office. During this conversation Dr. Smith told the witness that, according to members in plaintiff's locality, plaintiff had trouble with some of his patients. Dr. Straub denied, however, that Dr. Smith suggested in the telephone conversation that the witness withdraw his endorsement and stated that he did so only after talking to Drs. Cox and Ballard. He repeatedly testified that, on the occasion when he withdrew his signature, he accidentally met the last two doctors in a hallway at the meeting, that Drs. Hahn and Smith did not suggest to him that he talk to them, that when he later talked to Drs. Hahn and Smith in a private room the sole topic of conversation was the witness' preceptee and that no pressure had been put on him to withdraw his endorsement.

Dr. Hartman, the other endorser of plaintiff's application, also withdrew his signature at the P.C.S.O. meeting of March 20, 1962. He had known plaintiff only casually at the time the latter sought his endorsement. He testified that on that occasion plaintiff came to his office with the application, told him that Dr. Straub from San Mateo had signed the application, and when Dr. Hartman protested about his not being in plaintiff's locality, plaintiff said it was all right for any member of the constituent (P.C.S.O.) to sign and it was more convenient to get Dr. Hartman's signature in San Francisco at the time. Dr. Hartman, being extremely busy at the time and becoming agitated, signed the application. Subsequently,

Dr. Hartman filled out a questionnaire sent by the secretary of P.C.S.O., noting therein that since plaintiff's office was in Santa Rosa, he was unable to make a visit to it. Dr. Hartman then received a telephone call from Dr. Smith who asked him why he had signed plaintiff's application since he was not in the area where plaintiff practiced, informing Dr. Hartman at the same time that plaintiff had not taken some refresher courses as requested. At the P.C.S.O. meeting of March 20, 1962, Dr. Hartman asked Dr. Smith how he could withdraw his sponsorship of plaintiff's application and after obtaining some paper from Dr. Konigsberg, wrote out his withdrawal in Dr. Konigsberg's presence. Plaintiff learned of Dr. Hartman's action when he received Dr. Hartman's letter dated March 22, 1962, giving two reasons for the withdrawal of the endorsement: first, that he had recently learned of plaintiff's failure to comply with suggestions of the membership committee ''to take some refresher courses in Orthodontics'' which ''indicated, to me at least, that you either felt belligerent toward the men giving the advice or that you did not care''; and second ''simply that I should not be eligible to sign any way, not practicing in your immediate area.''

When plaintiff received word of the withdrawal of both endorsements, he discussed the matter on the telephone with both Dr. Smith and Dr. Hahn. These telephone conversations were the only steps taken by plaintiff in the way of voicing his grievances to P.C.S.O., its board or any of its officers after March 21, 1962, and up to the time he filed his complaint on April 27, 1962. Under cross-examination, plaintiff admitted that both doctors had told him that his application had not been denied and that he got the impression they would consider his application anyway when it would come up before the board of directors at their meeting in May 1962. Prior to that time plaintiff commenced the instant action.

On February 21, 1963, almost a year later, plaintiff wrote a letter to the Board of Directors of P.C.S.O., asking the board or the judicial committee to review the actions of the membership committee of the central component in refusing to accept or process his application for active membership and in causing the withdrawal of plaintiff's sponsors from his application. That letter was the only request of any kind which plaintiff made to any official of P.C.S.O. for review of his application. The answer to plaintiff's request was in the form of a letter from defendants' attorney, Mr. Kennedy, to plaintiff's attorney, Mr. Boessenecker, stating in substance

that the judicial committee had no jurisdiction over the matter until it was reviewed by the board of directors and that the board of directors would not take action until the instant legal action was disposed of.

Dr. Smith testified that while plaintiff's application without the required endorsers could not be acted upon by the membership committee, nevertheless in actuality plaintiff was not rejected, as he might have been had a properly completed application been acted upon, and thus remained eligible "so he could go to the courses, and get credit." Dr. Hahn testified to the same effect.

Plaintiff testified that his rejection for membership in defendant organizations would result in an immediate loss of professional standing in his community; that all of his patients were referred by other dentists who measure the ability of an orthodontist by whether he is a member of defendant organizations; that as a result his "supply of patients would be cut off"; and that he would be denied the privilege of ultimate certification by the appropriate qualifying board. There was evidence, and the parties seem to agree, that the American Board of Orthodontics is the only certifying board approved by the American Dental Association[9] having authority to certify a dentist as a diplomate in orthodontics, in other words certifying to his competence to practice orthodontics. For certification as a diplomate, the American Board of Orthodontics requires, *inter alia*, "Active membership in the American Association of Orthodontists for at least two years." The foregoing and other evidence received below was directed to the point that membership in defendant organizations is essential in order that a dentist may announce (e.g., by cards, letterheads, directory listings, etc.) that he limits his practice to orthodontics without violating the Principles of Ethics of the American Dental Association.[10] It

[9]The record shows that the American Board of Orthodontics was created by the American Society of Orthodontists, now defendant American Association of Orthodontists, and that its authority as a certifying agency was recognized by the American Dental Association through its Council on Dental Education.

[10]The particular regulation or canon of ethics permits such an announcement provided the dentist "has met the existing educational requirements and standards set by the American Dental Association . . . or possesses a state license permitting announcement in an area approved by the American Dental Association." Under the regulation such an announcement would be permitted *only* if the dentist were a diplomate of the American Board of Orthodontists (which requires membership in P.C.S.O. and A.A.O.) *or* if he were a member of, or eligible for member-

was therefore plaintiff's position in the court below, as it is here, that membership in defendant organizations is indispensable to compliance with the above canon of ethics and that if plaintiff should lose his status as an associate member and not be accepted as an active member, he could not announce his limitation of practice to orthodontics without violating the American Dental Association Principles of Ethics.

In essence it was plaintiff's theory below that, although he had complied with all requirements for active membership, defendants "wilfully and without right" refused to consider his second application filed in January 1962 and conspired together to prevent its being considered by making false and fraudulent representations about plaintiff, thereby causing the withdrawal of endorsements from his application.

The trial court, finding in favor of defendants on all material issues,[11] concluded that "plaintiff has no right of membership enforceable in the Courts"; that plaintiff has no right to a mandatory injunction; that "defendants have no legal obligation to show cause why plaintiff's application for active membership was not or should not be granted"; and that plaintiff's complaint should be dismissed. Judgment was entered accordingly.

Plaintiff's contentions on appeal may be summarized as follows: (1) that the court erred in its conclusion that plaintiff had no right of membership enforceable in the courts;

---

ship in, a specialty society officially related to the certifying board approved by the American Dental Association (in other words, the American Board of Orthodontists) this including only P.C.S.O. and A.A.O. *or* if he had a state license in orthodontics. (California's Dental Practice Act (Bus. & Prof. Code, §§ 1600-1752) does not license dentists to engage in specialty practice.)

[11]The trial court found *inter alia*: "5. That plaintiff is not in all respects properly qualified for active membership in the [defendant] associations . . . ; 6. That plaintiff has not complied with the by-laws of the said association in seeking admission to active membership status . . . ; 7. That plaintiff did not have proper endorsers and that said endorsers were not properly secured for his application for active membership; 8. That plaintiff has failed and refused to avail himself of all remedies available for relief within the structure of the said association; 9. That no unlawful conspiracy exists to deny the plaintiff active membership . . . and that no unlawful acts occurred designed to so deprive plaintiff of active membership; 10. That defendants did not wilfully or without right refuse to consider plaintiff's application for active membership; 11. That no actionable false or fraudulent statements have been made by any of the defendants pertinent to this action . . . ; 12. That plaintiff has been damaged in no actionable way or degree by any of the acts or omissions of defendants."

and (2) that the instant record conclusively establishes a conspiracy to exclude him from active membership.

At the outset it is not completely clear to us that the trial court's conclusion that plaintiff had no right of membership enforceable in the courts actually has the crucial significance at this posture of the case that its language imports. As we read the record, the court did not withhold judicial review of the controversy but inquired into the pertinent facts and circumstances, finding no wrongful acts and therefore denying relief. In view of this action by the court, its above conclusion seems to mean that plaintiff was not wronged by defendants, not that plaintiff had failed to show a justiciable cause. Nevertheless we propose to consider first whether the court below acted properly in granting judicial review and secondly whether its disposition of the matter is supported by the evidence.

As a general rule membership in a voluntary association is a privilege which may be granted or withheld by the association at its pleasure, not an enforceable right, and the courts will not interfere to compel admission to membership, no matter how arbitrary or unjust may be the rejection of the candidate. (6 Am.Jur.2d 443-445, 472-473; 5 Cal.Jur. 2d 463-464; *Tatkin* v. *Superior Court* (1958) 160 Cal.App.2d 745, 755 [326 P.2d 201]; see 89 A.L.R.2d 964.)

However, the cases have emphasized a distinction between situations involving the expulsion of a member and those involving a refusal to admit him in the first place. In instances of *expulsion,* as distinguished from *exclusion,* the courts have been inclined to grant at least a limited review and, where the expulsion has been wrongfully or arbitrarily brought about, to compel the reinstatement of the member. (See *Smith* v. *Kern County Medical Assn.* (1942) 19 Cal.2d 263, 265 [120 P.2d 874]; *Bernstein* v. *Alameda etc. Medical Assn.* (1956) 139 Cal.App.2d 241, 253 [293 P.2d 862]; 89 A.L.R.2d 964, 966.) The principles governing judicial review in such situations were stated in *Smith* as follows: ''In any proper case involving the expulsion of a member from a voluntary unincorporated association, the only function which the courts may perform is to determine whether the association has acted within its powers in good faith, in accordance with its laws and the law of the land. [Citations.]'' (P. 265.) It has been said ''that courts are reluctant to interfere in the internal affairs of private voluntary associations . . . [and]

rarely grant relief to a person expelled or excluded from a voluntary association.'' (15 Rutgers L. Rev. 327, 329.)

By an argument somewhat obliquely presented,[12] plaintiff seems to invoke the more protective influence of the rule dealing with expulsion cases urging that in reality his plight can also be viewed in that category because of his associate membership. ▆▆ We do not believe that plaintiff has a contractual right (see *Bernstein* v. *Alameda etc. Medical Assn., supra*, 139 Cal.App.2d 241, 253; 15 Rutgers L. Rev. 327, 330-335) to become an active member simply because he has been an associate member. Under the bylaws of A.A.O. (see fn. 2, *ante*) if he does not qualify for active membership after five years of associate membership, or if he does not become an active member within one year after he qualifies for active membership, his associate membership shall terminate. Under the bylaws of P.C.S.O. (see fn. 3, *ante*) his associate membership terminates automatically one year after ''eligibility'' for active membership is reached. There is nothing in the pertinent evidence indicating that active membership in defendant associations in some way derives from or depends upon associate membership so as to impart some right to the former flowing as an incident from the latter. In the instant action plaintiff is not litigating his expulsion as an associate member but his attempted admission as an active member. It is this latter aspect which constitutes the present controversy.

On the issue as to whether this controversy is justiciable the parties have taken sharply divergent positions while seemingly recognizing the applicable legal criteria. Plaintiff concedes that a court will not act to compel admission to a social or fraternal organization but argues that the rule is different in situations involving professional societies' membership which is essential to the right to earn a living. He places special reliance on *James* v. *Marinship Corp.* (1944) 25 Cal.2d 721, 731 [155 P.2d 329, 160 A.L.R. 900] and *Falcone* v. *Middlesex County Medical Society* (1961) 34 N.J. 582 [170 A.2d 791, 89 A.L.R.2d 952]. *James* held that a union which has ''attained a monopoly of the supply of labor . . . may no longer claim the same freedom from legal restraint enjoyed by golf clubs or fraternal associations. Its asserted right to

---

[12]Plaintiff argues that, being an associate member, his present position is not one of ''an outsider attempting to breach a wall'' and that because defendants refuse to permit ''his advancement to active membership'' he actually faces automatic expulsion from defendant societies.

choose its own members does not merely relate to social relations; it affects the fundamental right to work for a living. [Citations.]'' (P. 731.) (See also *Dotson* v. *International Alliance etc. Employes* (1949) 34 Cal.2d 362 [210 P.2d 5]; *Cason* v. *Glass Bottle Blowers Assn.* (1951) 37 Cal.2d 134 [231 P.2d 6, 21 A.L.R.2d 1387]; *Thorman* v. *International Alliance etc. Employees* (1958) 49 Cal.2d 629 [320 P.2d 494].)

In *Falcone*, the plaintiff, a doctor of osteopathy and a doctor of medicine, was licensed to practice medicine and surgery by the New Jersey State Board of Medical Examiners. Although admitted as an *associate* member of defendant county medical society, plaintiff was refused *active* membership therein because he had not completed four years of study at a medical college approved by the American Medical Association of which defendant society through its state medical society was a component. Hospitals in the area required their staff physicians to be members of the defendant county medical society and upon its refusal to admit plaintiff, dropped him from their staffs. The defendant's refusal of membership thus had ''seriously adverse economic and professional effects'' (89 A.L.R.2d at p. 958) on the plaintiff.

A judgment ordering his admission to the society was affirmed on appeal. The court, relying *inter alia* upon *James* v. *Marinship Corp., supra,* said: ''When courts originally declined to scrutinize admission practices of membership associations they were dealing with social clubs, religious organizations and fraternal associations. Here the policies against judicial intervention were strong and there were no significant countervailing policies. When the courts were later called upon to deal with trade and professional associations exercising virtually monopolistic control, different factors were involved. The intimate personal relationships which pervaded the social, religious and fraternal organizations were hardly in evidence and the *individual's opportunity of earning a livelihood and serving society in his chosen trade or profession appeared as the controlling policy consideration.* ... Through its interrelationships, the County Medical Society possesses, in fact, a virtual monopoly over the use of local hospital facilities. As a result it has power, by excluding Dr. Falcone from membership, to preclude him *from successfully continuing in his practice of obstetrics and surgery* and *to restrict patients* who wish to engage him as an obstetrician or surgeon in their freedom of choice of physicians. Public policy

strongly dictates that this power should not be unbridled but should be viewed judicially as a fiduciary power to be exercised in reasonable and lawful manner for the advancement of the interests of the medical profession and the public generally; . . .'' (Italics added.) (89 A.L.R.2d at p. 963.)

Defendants make reference to *James* and *Falcone* but take the position that neither case is here applicable for the alleged reason that defendant organizations herein do not have such control over the very right to earn a living.[13]

The uncontradicted evidence in the record before us shows that while plaintiff may lawfully practice his specialty of orthodontics in California without being a member of either A.A.O. or P.C.S.O., as previously pointed out, under the canons of ethics of the American Dental Association, he may not announce that he limits his practice to orthodontics unless he is a member of defendant organizations. (See fn. 10, *ante.*) Plaintiff testified that without such membership, his practice would be affected, he would suffer a loss of professional standing, and his supply of patients, depending principally upon referrals from other dentists, would be cut off. In addition he would lose Public Health patients for the treatment of whom such membership is required. ██ It is common knowledge that in this day of specialization, the doctor or dentist limiting his practice to a specialty enjoys a prestigious position with attendant economic advantages. It appears to us on this record that as a practical matter, an orthodontist like plaintiff cannot successfully limit his practice to orthodontics unless he becomes an active member of defendant organizations. These are the realities of the situation.

As we stated previously, the findings of fact and conclusions of law, considered as a whole, indicate not that the court declined to review the case but that it denied relief after having done so. Defendants argue that the court expressly or at least by implication found that membership in defendant organizations was not an economic necessity for plaintiff. An examination of the record discloses no such express finding and, in our view, there is no implied finding to such effect. The pretrial conference order does not list the

---

[13]Defendants argue that the instant case falls within the same category as: *Hawkins* v. *North Carolina Dental Society* (D.C.W.D. N.C. 1964) 230 F.Supp. 805; *Salter* v. *New York State Psychological Assn.* (1964) 14 N.Y.2d 100 [198 N.E.2d 250]; *Schwankert* v. *New Jersey State Patrolmen's Benevolent Assn.* (1962) 77 N.J.Super. 224 [185 A.2d 877]; *Baltimore County Hospital* v. *Maryland Hospital Service, Inc.* (1964) 234 Md. 427 [200 A.2d 39].

economic necessity of membership among the issues remaining in dispute. The court found in effect that defendants committed no unlawful acts and did not wilfully or without right refuse to consider plaintiff's application. Considering the conclusion of law in question in the light of the findings, we do not construe it to mean that judicial review was unavailable, for the trial court did grant such review. Whether its consequent denial of relief is supported by the present record is a question we discuss *infra*.

We therefore conclude that it was within the province of the trial court to review and inquire into the facts and circumstances pertinent to the alleged exclusion of plaintiff from defendant organizations to determine whether the power of these groups was exercised arbitrarily or unlawfully in order to prevent plaintiff from successfully practicing orthodontics. (*James* v. *Marinship Corp., supra,* 25 Cal.2d 721; *Falcone* v. *Middlesex County Medical Society, supra,* 34 N.J. 582 [170 A.2d 791, 89 A.L.R.2d 952].)

We come now to the second main issue on appeal. The court below having properly inquired into the controversy at hand, we must now determine whether the findings underlying its denial of relief are supported by the evidence or, to state it another way, whether, as plaintiff here contends, the evidence is such as to conclusively establish as a matter of law a conspiracy to exclude him from active membership. We have concluded that the findings are supported and that plaintiff's argument that a conspiracy should be found to exist at this posture of the case is wholly untenable.

The crucial findings which support the judgment are numbers 9 to 11 inclusive (see fn. 11, *ante*) stating in substance that no conspiracy existed, no unlawful acts were committed to deprive plaintiff of membership, no wrongful refusal to consider plaintiff's second application occurred and no actionable false or fraudulent statements were made. In essence the trial court determined that defendants did not wrongfully or arbitrarily exclude plaintiff from membership.

The evidence summarized by us in considerable detail above, together with the reasonable inferences deducible therefrom, amply supports the above findings and at the same time justifies the judgment. It is reasonably inferable that plaintiff received no arbitrary or improper treatment at the hands of defendants' representatives; that he was given a fair examination by a representative group of experienced orthodontists;

and that, upon his failure to pass it, he was given an opportunity to avoid the publicized stigma of failure, to withdraw his application and remain an associate member and finally, to prepare himself for another test.

At the heart of this controversy is of course the question whether defendants wrongfully brought about the withdrawal of the signatures of plaintiff's sponsors on his second application. The relevant evidence has been set forth above in the light of the familiar rules of appellate review. It was clearly within the province of the trier of fact to accept the testimony of the two doctor sponsors and the related testimony of Drs. Hahn and Smith. The court could reasonably conclude that Drs. Straub and Hartman withdrew their respective signatures in the manner, under the circumstances and for the reasons given by them; that said doctors felt they did not know enough about plaintiff to vouch for his professional competence; and that their decision to withdraw sponsorship was prompted by honest motives and a sense of professional responsibility rather than effected by connivance or pressure on the part of defendants' representatives. In the same way the court could conclude that the activities of Drs. Hahn and Smith in connection with the incident emanated not from a conspiracy, as claimed by plaintiff, but from a sincere sense of responsibility to their profession, the public and even to plaintiff himself. Plaintiff at this posture of the case would have us brush aside all these findings and the manifold inferences embraced within them and indulge in the imperative that they conclusively establish the conspiracy and nefarious scheming which is the gravamen of his case. No citation of authority is needed to make clear that this court cannot accept such an argument. While plaintiff takes umbrage at the charge, nevertheless it seems clear to us, both from his briefs and oral argument, that he attempts to construct a conspiracy largely through a selective process of favorable evidence, ignoring the plain reality that the trial court, acting within its proper province, has passed upon the credibility of the witnesses and drawn the inferences from their testimony.

Anent this aspect of the case, we take note of plaintiff's claim that orthodontists in his area were unfriendly to him and as part of the charged conspiracy or at least with improper motives refused to sign his application. However the court could properly infer that this resulted not from improper actions but from those of honest professional purpose and upon sound and sincere reasons. Lending support to

this is the evidence that plaintiff was given the privilege of a second examination and an opportunity to improve himself in the meantime and the further evidence that the Santa Rosa doctors offered to sign his application if plaintiff would permit them to come to his office and inspect his work. All in all, on this record, it can be reasonably inferred that plaintiff, having decided to reject the opportunities and suggestions made available to him after his first failure, insisted upon proceeding with his second application with the attitude that his qualifications were sufficient and that he should be admitted forthwith without the necessity of submitting his work to the inspection of his colleagues.

It is clear of course that upon withdrawal of plaintiff's sponsors, his application no longer complied with the bylaws and that the court's findings to that effect (findings 6 and 7, see fn. 11, *ante*) are supported. The crucial question as to whether this withdrawal was arbitrarily or wrongfully accomplished has already been discussed in detail. Plaintiff thus faces this hard ineluctable fact: Since he was not ''recommended by two active members of the Constituent Society within whose jurisdiction he intends to practice'' (i.e., P.C.S.O.; see fn. 2, *ante*) and since he is not ''recommended by two active members of the component to which he applies'' (i.e., the central component; see fn. 3, *ante*) he is not qualified for active membership. The various qualifying requirements which have impeded plaintiff's admission to membership in defendant organizations are directed only to his professional qualifications. We cannot say on this record that they are arbitrary or unreasonable or that they have been applied or construed in plaintiff's case in an arbitrary, unreasonable or wrongful manner. We need not discuss whether under the evidence plaintiff has failed or refused to pursue other remedies within the internal structure of defendant organizations since the failure to comply with pertinent bylaws governing his application for membership constitute a fatal disability supporting the court's denial of relief.

The judgment is affirmed.

Molinari, J., and Bray, J.*, concurred.

A petition for a rehearing was denied October 19, 1965, and appellant's petition for a hearing by the Supreme Court was denied November 24, 1965.

*Retired Presiding Justice of the District Court of Appeal sitting under assignment by the Chairman of the Judicial Council.