[L.A. No. 30228. In Bank. Sept. 20, 1974.]

LEON J. PINSKER, Plaintiff and Appellant, v.
PACIFIC COAST SOCIETY OF ORTHODONTISTS et al.,
Defendants and Respondents.

**COUNSEL**

Gyler & Gottlieb and Emanuel Gyler for Plaintiff and Appellant.

Hassard, Bonnington, Rogers & Huber, Overton, Lyman & Prince, Fred S. Lack, Jr., and Richard G. Logan for Defendants and Respondents.

**OPINION**

**TOBRINER, J.**—Dr. Leon Pinsker, a licensed dentist specializing in orthodontics, commenced this action in August 1962, contending that the de-

fendant orthodontist societies[1] had arbitrarily rejected his aplication for membership. In the initial phase of these proceedings, defendants contended that because membership in their association was not an "economic necessity" for Dr. Pinsker, the organizations' admission decisions were not properly subject to judicial review even if Pinsker had been arbitrarily or capriciously excluded. The trial court granted judgment for defendants, but on appeal our court reversed, concluding that "[b]ecause of the unique position in the field of orthodontics ogcupied by defendant . . . organizations . . . a public interest is shown, and the associations must be viewed as having a fiduciary responsibility with respect to the acceptance or rejection of membership applications." (*Pinsker* v. *Pacific Coast Soc. of Orthodontists* (1969) 1 Cal.3d 160, 166 [81 Cal.Rptr. 623, 460 P.2d 495].)

We held that "an applicant for membership has a judicially enforceable right to have his application considered in a manner comporting with the fundamentals of due process, including the showing of cause for rejection." (*Id.*) We remanded the matter to the trial court to afford defendants an opportunity to demonstrate that they had met these requirements in rejecting Dr. Pinsker's membership application.

On remand, defendants based their exclusion of Dr. Pinsker on the ground of his continuing violation of one of the societies' "Principles of Ethics," a provision prohibiting an orthodontist from "delegating to a person less qualified any services or operation which requires the professional competence of an orthodontist." Dr. Pinsker challenged the defendants' position on three grounds: first, he contended that under any reasonable interpretation of the rule his conduct did not violate it; second, that even under the societies' interpretation of the rule he commited no violation; and third, that in any event the societies rejected his application arbitrarily because they did not give him an opportunity to respond to the charges against him.

The trial court ruled in favor of defendants, upholding the societies' interpretation of the rule, and concluding that on the basis of the evidence Dr. Pinsker had indeed violated it. Although the court recognized that the societies had not afforded Dr. Pinsker an opportunity to respond to

---

[1]Three related organizations are joined as defendants: the American Association of Orthodontists (hereafter referred to as the national society or organization), the Pacific Coast Society of Orthodontists (the regional society or organization) and the Pacific Coast Society of Orthodontists, Southern Component (the local society or organization). The local society is primarily responsible for passing on membership applications; acceptance by the local society apparently automatically qualifies one as a member of both the regional and national societies.

the charges or a hearing of any sort, the court held that precedent called for no such opportunity.

As discussed below, we have decided that in rejecting Dr. Pinsker's application, defendant societies failed to comply with the minimal requisites of a fair procedure required by established common law principles. As our past cases recognize, an organization's decision to exclude or expel an individual may be "arbitrary" either because the reason for the exclusion or expulsion is itself irrational or because, in applying a given rule in a particular case, the society has proceeded in an unfair manner. Although the fair procedure required in this setting clearly need not include the formal embellishments of a court trial, an affected individual must at least be provided with some meaningful opportunity to respond to the "charges" against him.

We have further concluded that in reconsidering Dr. Pinsker's application, defendants may validly impose the nondelegation rule and may properly reject his application if he has in fact continued to share patients with a dentist who lacks the requisite educational qualifications for membership in defendant societies.

### 1. The facts.

Dr. Pinsker obtained a general license to practice dentistry in California in 1953 and began his practice in this state the following year. In 1956, Pinsker formed a partnership in the City of Long Beach with Dr. Max Schleimer, a dentist who since 1954 had limited his practice to orthodontics; thereafter, both Pinsker and Schleimer practiced only orthodontics. California does not provide for the separate licensing of specialists in the field of orthodontics and thus all licensed dentists can legally practice this specialty.

In 1958, Pinsker enrolled in a 16-month post-graduate course at Columbia University Division of Orthodontics in New York City. He successfully completed the course in January 1960, and received a Certificate of Training in Orthodontics, the rough equivalent of a master's degree. In May 1959, while still at Columbia, Pinsker submitted an application for membership to the local society.[2] In the fall of 1959, before Pinsker returned

---

[2]In our opinion, we discussed the interrelationship of the defendant organizations, their various professional functions and their prestigious position in the field of orthodontics. We need not repeat that discussion here but note simply that the national society and its constituent bodies are widely recognized as the sole professional organizations in this country which set standards for, and certify proficiency in, the practice of orthodontics. (See *Pinsker* v. *Pacific Coast Soc. of Orthodontists, supra,* 1 Cal.3d 160, 163, 166.)

from New York, a member of the local society, Dr. Spears, visited the offices of Pinsker and Schleimer at the request of the chairman of the local society's membership committee, and wrote a brief note to the chairman listing the personnel employed at the offices.[3]

Several months thereafter, in April 1960, Spears discussed his visit to Pinsker's office at a meeting of the local society's membership committee, reporting that Pinsker had a partnership arrangement with Dr. Schleimer, who was not a member of defendant organizations and who did not possess the requisite post-graduate course work then required for eligibility. Dr. Cottingham, the chairman of the local membership committee, testified that at approximately the same time he received information from another society member, Dr. Donaldson, indicating that Pinsker and Schleimer "shared" patients, that is, each worked on all the patients who came into the office.

At trial Dr. Cottingham explained that the committee members felt that if Pinsker were permitting Schleimer to perform orthodontic work on Pinsker's patients, Pinsker would probably be in violation of section 3 of the association's "Principles of Ethics," which provided in part: "The orthodontist has an obligation to protect the health of his patient by not delegating to a person less qualified any service or operation which requires the professional competence of an orthodontist." The members interpreted the phrase "person less qualified" to include a licensed dentist who did not have the requisite education qualifications to be eligible for membership in their societies; thus, if Pinsker were sharing patients with Schleimer, they believed that he would be improperly delegating work to a "person less qualified."

As a result of the questions raised at the meeting, Dr. Cottingham wrote a letter to Pinsker on May 2, requesting a clarification of his partnership practice. This letter, however, did not specify the society's particular concern but simply requested, in general terms, that Pinsker "give a descrip-

---

[3]Dr. Spears' note to the committee chairman stated: "Pinsker in Lakewood is a bit questionable. He is back at Columbia now finishing his course. Has a couple of New York *boys* [original italics] running his office. Three nurses, a lab. man and the two dentists. [¶] I will call on him when he returns in January. I see no hurry in processing him until he finishes his course at least."

The note's reference to "New York *boys*" remains unexplained. Testimony at trial established that neither Schleimer nor the other dentist present at the time of Spears' visit (Pinsker's temporary replacement) were from New York and that neither was particularly young for a practicing dentist. In addition, although the note indicated that Spears intended to call on Pinsker when he returned from Columbia, the record shows that Spears never made another visit to Pinsker's offices nor contacted him in any way.

tion of your practice, the number and status of your partners or associates and copies of your office stationery."[4] Pinsker responded on May 9, 1960, disclosing that he had "been engaged in the exclusive practice of orthodontics since January of 1957, with my partner Dr. Max Schleimer."

On May 11, 1960, the local membership committee again met and formally took up Pinsker's application for association membership. Pinsker was given no indication that he might be in violation of the societies' non-delegation rule and no opportunity either in writing or in person to present his side of the story. On the basis of the limited information before it, the membership committee voted unanimously to reject Pinsker's application on the ground that he was engaged in a patient-sharing practice which constituted a violation of the non-delegation rule.

Shortly thereafter, Dr. Neff, the secretary of the local society, informed Pinsker that his membership application had been denied. Pinsker at first unsuccessfully sought an explanation of the reason for the society's denial but ultimately found it lay in his alleged sharing of patients with Dr. Schleimer. Pinsker testified that he discontinued this practice in late July 1960.

In June 1960, after Pinsker had questioned the basis for his rejection, the local society rescinded its initial rejection of Pinsker and notified him that his application had been reinstated and that he would "hear the outcome . . . in the near future." Months later, on January 9, 1961, the local society, after some communication with the regional and national societies, considered Pinsker's application for a final time. Pinsker was not afforded an opportunity either to appear in person or submit a written statement on his own behalf for consideration at the meeting.

Aside from the information which had been related eight months earlier by Dr. Spears and Dr. Donaldson, the only information before the committee on January 9 consisted of a report by Dr. Neff on a conversation that he had had with two orthodontists "while waiting for lunch" earlier that same day. In his deposition[5] Dr. Neff recalled the conversation as fol-

---

[4]Dr. Cottingham's May 2 letter to Pinsker reads in pertinent part: "Doctor Robert Lee, Chairman of the Southern Component of the Pacific Coast Society of Orthodontists, has informed me that you have completed your graduate [work] at Columbia University and wish to have your application for associate membership reprocessed.

"The membership committee is proceeding with your applicaion. Will you send me a brief description of your course, the number of clock hours involved and the nature of the degree that you received. Also will you please give a description of your practice, the number and status of your partners or associates and copies of your office stationery."

[5]Plaintiff objected to the admission of Dr. Neff's deposition on the ground that defendants had not shown that Neff was currently unavailable to testify. At the earlier

lows: "I asked Dr. Shannon and Dr. Jensen, both of whom practice in Long Beach, if they still knew whether Dr. Pinsker still employed these two dentists.[6] Both replied that they were certain that at least one was still there." This statement, of course, indicates only that Pinsker and Schleimer were still in practice together in January 1961, and does not establish that Dr. Shannon or Dr. Jensen knew whether the dentists' "patient-sharing" procedure had continued. Nevertheless, on the basis of the foregoing matter, the local society decided to reject Pinsker's application for membership,

On January 23, 1961, Dr. Pinsker was notified that his application for membership had been denied; no reason was given for the decision. Pinsker commenced the present action on August 2, 1962.

At the trial defendants contended that since Pinsker had violated the society's non-delegation rule, they did not arbitrarily reject Pinsker's application. In support of this contention, defendants called as a witness an officer of the national association who testified that the "common understanding" within the national association was that the proscription on delegation of orthodontic operations applied to *all* persons not qualified for membership in defendant societies, including licensed dentists. Because it was conceded that Dr. Schleimer lacked the requisite educational qualifications for membership, at least under 1960 standards, defendants maintained that so long as Pinsker continued to share patients with Schleimer, the societies were justified in rejecting his application.

Defendants also called a number of former patients of Pinsker and Schleimer, who testified that the patient-sharing procedure continued well after July 1960, when Pinsker testified that he had fully implemented his patient segregation system. Although this evidence had not been presented to the local society when it rejected Pinsker in January 1961, and, for the most part involved incidents occurring well after such rejection, the trial court considered that testimony.

In response, Pinsker posited the arbitrariness of his rejection on three

---

phase of the trial, prior to this court's first opinion, the defendants had produced medical evidence that Neff could not testify in person because of a heart condition. Although that medical evidence was somewhat stale by the time the trial was resumed after appeal, plaintiff did not produce any evidence to suggest that Neff's physical condition had improved and the trial court admitted the evidence. Plaintiff now complains that the admission of this matter was reversible error, but since we have determined that plaintiff is entitled to reconsideration of his application on other grounds, we need not pass on the propriety of the trial court's ruling.

[6]Dr. Neff was apparently under the mistaken belief that Pinsker's temporary replacement had remained in the office after Pinsker's return from Columbia.

separate grounds. First, the society had failed to afford him a fair opportunity to be heard. Second, he had in fact segregated his patients as soon as he had been advised to do so by defendants; he testified that thereafter Dr. Schleimer only worked on his patients in "emergencies." Finally, even if his "patient-sharing" had continued, the society's non-delegation rule could not reasonably be construed to prohibit the delegation of work to a licensed dentist.

The trial court rejected all of Pinsker's contentions and awarded judgment for defendants. Although it acknowledged that the societies had afforded Pinsker no opportunity to be heard, the court concluded that since the defendants had conducted some investigation into the matter and since the application had not been "summarily denied," the requirements of procedural fairness had been satisfied. On the factual question of whether Pinsker had actually segregated his patients in July 1960, the court resolved the conflicting testimony against Pinsker and found that the sharing of patients had continued well after his rejection in January 1961. Finally, the court concluded that defendants' interpretation of the non-delegation rule was not arbitrary.

2. *In light of defendants' important public role, the societies could not reject plaintiff's membership application without affording him a fair opportunity to respond to the charges against him.*

    a. *Under established common law precedents, the proscription of "arbitrary" rejections prohibits rejection pursuant to an unfair procedure as well as rejection based on an improper reason.*

In our initial *Pinsker* opinion we held that in light of the special position occupied by defendant organizations in the professional field of orthodontics "an applicant for membership has a judicially enforceable right to have his application considered *in a manner comporting with the fundamentals of due process, including the showing of cause for rejection.*" (Italics added; *Pinsker v. Pacific Coast Soc. of Orthodontists, supra,* 1 Cal.3d 160, 166 [hereafter *Pinsker I*].) Defendants contend that under this holding judicial review is limited to determining whether there was "cause" for rejection, that is, whether the applicant was rejected for an accepted noncapricious reason. Because *Pinsker I* did not explicitly elaborate a requirement of a fair decision-making *procedure,* defendants claim that they need only demonstrate that as a *substantive* matter the reason for Pinsker's rejection was not irrational. In other words, defendants initially claim that they were under no legal constraints to follow a fair procedure in determining whether or not to exclude Pinsker from their organizations.

This attempt to confine our prior holding to matters of "substantive" nonarbitrariness, however, ignores the entire body of common law precedents[7] upon which *Pinsker I* rests. As we shall explain, these authorities recognize that an organization's decision to expel or exclude an individual may be arbitrary either because the reason underlying the rejection is irrational or because the organization has proceeded in an unfair manner. ■ Taken together, these decisions establish the common law principle that whenever a private association is legally required to refrain from arbitrary action, the association's action must be both substantively rational and procedurally fair. A review of the cases makes this overriding principle abundantly clear.

In *Falcone* v. *Middlesex County Medical Soc.* (1961) 34 N.J. 582 [170 A.2d 791, 89 A.L.R. 952], the seminal decision in this country granting judicial review of a professional association's rejection of an application for membership, the court canvassed the historical development of judicial decisions in this entire field. The *Falcone* court observed that while courts in general "have been understandably reluctant to interfere with the internal affairs of membership associations . . . in particular situations, where the considerations of policy and justice were sufficiently compelling judicial scrutiny and relief were not found wanting." (170 A.2d at p. 796.) As the *Falcone* court noted, the earliest common law response came in "situations involv[ing] improper *expulsions* from pre-existing membership which called forth judicial directions for reinstatement or other suitable relief." (Italics added; *id.*)[8]

---

[7] It is important to note that the legal duties imposed on defendant organizations arise from the common law rather than from the Constitution as such; although *Pinsker I* utilized "due process" terminology in describing defendant associations' obligations, the "due process" concept is applicable only in its broadest, nonconstitutional connotation. (See Selznick, Law, Society and Industrial Justice (1969) p. 257.) In an attempt to avoid confusing the common law doctrine involved in the instant case with constitutional principles, we shall refrain from using "due process" language and shall simply refer instead to a requirement of a "fair procedure."

[8] In *Dawkins* v. *Antrobus* [1881] 17 Ch.D. 615, an English court of appeal established that a court would provide relief to any individual expelled from a private association who could demonstrate (1) that the society's rule or proceedings were contrary to "natural justice," (2) that the society had not followed its own procedures or (3) that the expulsion was maliciously motivated. The English common law concept of "natural justice" includes the basic principle "that a man may not be condemned unheard." (See Wade, Administrative Law (Oxford 1967) p. 154. See generally, Chafee, *The Internal Affairs of Associations Not for Profit* (1930) 43 Harv.L.Rev. 993, 1014-1020; Grodin, Union Government and the Law: British and American Experiences (1961) p. 101.)

This common law principle authorizing judicial review of association expulsions became a part of California law as early as 1888 (*Otto* v. *Tailors' P. & B. Union,* 75 Cal. 308 [17 P. 217]). Since then, this common law principle has been reiterated in a long and unbroken line of California decisions. (See *Von Arx* v. *San Francisco G.*

The *Falcone* court proceeded to explain· that the common law principle of judicial review of expulsions from membership associations had developed, in more recent years, to encompass a comparable judicial scrutiny of *exclusions* from membership in a special, limited category of private associations such as labor unions or professional and trade associations. Because of ·their monopolistic position in a given field ·of employment, such organizations wield enormous power, and for an individual seeking to make a living in a given trade or profession, membership in such organizations is frequently "an economic necessity."

As *Falcone* recognized, one of the earliest and most influential decisions applying common law principles to a private association's exclusion from membership was Chief Justice Gibson's celebrated opinion for this court in *James* v. *Marinship Corp.* (1944) 25 Cal.2d 721 [155 P.2d 329, 160 A.L.R. 900], invalidating a labor union's policy of excluding blacks from full membership. In *Marinship* our court declared: "Where a union has . . . attained a monopoly of the supply of labor . . . such a union occupies a quasi public position similar to that of a public service business and it has certain corresponding obligations. It may no longer claim the same freedom from legal restraint enjoyed by golf clubs or fraternal associations. Its asserted right to choose its own members does not merely relate to social relations; it affects the fundamental right to work for a living. [Citation.]" (25 Cal.2d at p. 731.)[9]

Finding the underlying rationale of *Marinship* applicable to a medical society that enjoyed a virtual monopoly over the use of local hospital facilities, the *Falcone* court upheld the propriety of judicial review of the medical society's rejection of the application ·of ·a physcian for membership. After undertaking such review, the court decided that the society's

*Verein* (1896) 113 Cal. 377 [45 P. 685]; *Taboada* v. *Sociedad Espanola etc.* (1923) 191 Cal. 187, 191-192 [215 P. 673, 27 A.L.R. 1508]; *Ellis* v. *American Federation of Labor* (1941) 48 Cal.App.2d 440, 443-444 [120 P.2d 79]; *Cason* v. *Glass Bottle Blowers Assn.* (1951) 37 Cal.2d 134, 143-144 [231 P.2d 6, 21 A.L.R.2d 1387]; *Swital* v. *Real Estate Commissioner* (1953) 116 Cal.App.2d 677, 679 [254 P.2d 587]; *Cunningham* v. *Burbank Bd. of Realtors* (1968) 262 Cal.App.2d 211, 214 [68 Cal.Rptr. 653]; *Ascherman* v. *San Francisco Medical Soc.* (1974) 39 Cal.App.3d 623 [114 Cal. Rptr. 681].)

[9]Quoting from an earlier New Jersey decision, Chief Justice Gibson explained the common law basis of the obligations imposed ·on such an organization: " '[A] monopoly raises duties which may be enforced against the possessors of the monopoly. This has been recognized from the earliest times. The rule that one who pursued a common calling was obliged to serve all comers on reasonable terms seems to have been based on the fact that innkeepers, carriers, farriers, and the like, were few, and each had a virtual monopoly in his neighborhood. . . . [T]he holders of the monopoly must not exercise their power in an arbitrary, unreasonable manner so as to bring injury to others.' " (25 Cal.2d at p. 732, quoting *Wilson* v. *Newspaper & Mail Deliverers' Union* (1938) 123 N.J. Eq. 347 [197 A. 720].)

ground for exclusion "must be viewed as patently arbitrary and unreasonable and beyond the pale of the law." (170 A.2d at p. 800.)

Our decision in *Pinsker I* represents our most recent application of the general common law principles which originated in the association expulsion cases and which through *Marinship, Falcone* and similar authorities,[10] have been applied to the exclusion of members by "public service" organizations. (See Tobriner & Grodin, *The Individual and the Public Service Enterprise in the New Industrial State* (1967) 55 Cal.L.Rev. 1247, 1256-1260.) In *Pinsker I* we concluded that although membership in defendant orthodontic associations could not be said to be "an economic necessity," the associations still wielded monopoly power and affected sufficiently significant economic and professional concerns so as to clothe the societies with a "public interest."[11]

Thus, *Pinsker I* constitutes only the latest development in a century-old progression of common law decisions establishing the proper role which courts should play with respect to membership decisions reached by private associations. Throughout this progression, the authorities indicate that once it is determined that judicial scrutiny of a particular decision is justified to protect against arbitrary action, such overview includes an evaluation of both the substantive and procedural aspects of the association's decision. (See generally Chafee, *The Internal Affairs of Associations Not for Profit* (1930) 43 Harv.L.Rev. 993, 1014-1020.) California decisions clearly illustrate the dual nature of this review.

In situations involving the expulsion of members from a society, the

---

[10]See, e.g., *Williams* v. *Int. etc. of Boilermakers* (1946) 27 Cal.2d 586 [165 P.2d 903]; *Thorman* v. *Intl. Alliance etc. Employees* (1958) 49 Cal.2d 629 [320 P.2d 494]; *Directors' Guild of America, Inc.* v. *Superior Court* (1966) 64 Cal.2d 42, 52-54 [48 Cal.Rptr. 710, 409 P.2d 934]; *Wyatt* v. *Tahoe Forest Hospital Dist.* (1959) 174 Cal. App.2d 709 [345 P.2d 93]; *Martino* v. *Concord Community Hosp. Dist.* (1965) 233 Cal.App.2d 51, 56-57 [43 Cal.Rptr. 255]; *Kronen* v. *Pacific Coast Society of Orthodontists* (1965) 237 Cal.App.2d 289 [46 Cal.Rptr. 808].

[11]Our holding in *Pinsker I* that a strict showing of "economic necessity" is not an indispensible prerequisite to judicial review was presaged by the court's decision in *Directors' Guild of America, Inc.* v. *Superior Court, supra,* 64 Cal.2d 42, 52-54. In *Directors' Guild* we recognized that although membership in a labor union that did not have a union shop contract might not be an "economic necessity" for an employee in the trade, in practical terms his exclusion from membership worked significant economic and professional hardship. Consequently we declared: "The . . . grounds for condemnation of arbitrary rejection from membership apply as forcefully to the situation in which the union does not have a union shop contract as to that in which it does. The need of the worker for union participation is not reduced because the union does not enjoy a union shop; the basis for membership lies in the right and desirability of representation, not in the union's economic control of the job." (64 Cal.2d at pp. 53-54; see also *Kronen* v. *Pacific Coast Society of Orthodontists, supra,* 237 Cal. App.2d 289, 304.)

courts have long held that procedural fairness is an indispensible pre-requisite.  ██  "In this state 'a member of an unincorporated association may not be suspended or expelled . . . without charges, notice and a hearing, even though the rules of the association make no provision therefor.'" (*Swital* v. *Real Estate Commissioner, supra,* 116 Cal.App.2d 677, 679; *Cason* v. *Glass Bottle Blowers Assn., supra,* 37 Cal.2d 134, 143-144.) This requirement of procedural fairness has been an established part of the California common law since before the turn of the century. (See, e.g., *Von Arx* v. *San Francisco G. Verein, supra,* 113 Cal. 377; *Otto* v. *Tailors P. & B. Union, supra,* 75 Cal. 308, 314-315.)

In addition to requiring a fair procedure, the common law decisions establish that an expulsion from an association cannot properly rest upon a rule which is substantively capricious or contrary to public policy. Thus, for example in *Bernstein* v. *Alameda etc. Med. Assn.* (1956) 139 Cal.App. 2d 241 [293 P.2d 862], the court held that the defendant medical society could not lawfully expel a doctor for making disparaging statements about another doctor's professional work in the course of legal proceedings. (See also *Higgins* v. *American Society of Clinical Pathologists* (1968) 51 N.J. 191 [238 A.2d 665, 671]; *Spayd* v. *Ringing Rock Lodge No. 665* (1921) 270 Pa. 67 [113 A. 70, 14 A.L.R. 1443]; *Hurwitz* v. *Directors Guild of America, Inc.* (2d Cir. 1966) 364 F.2d 67, 73-77.)

Defendants concede that courts have applied this dual-pronged analysis in reviewing *expulsion* decisions but contend that in the *exclusion* area courts have confined their review of arbitrariness to substantive matters, and have not required compliance with procedural fairness. Defendants apparently rely on the fact that in both the *Marinship* and *Falcone* cases the arbitrariness issue arose in a substantive context.

The authorities, however, belie the defendants' claim that the requirement of procedural fairness adheres only in expulsion cases. In *Wyatt* v. *Tahoe Forest Hospital Dist., supra,* 174 Cal.App.2d 709, for example, the court invalidated the rejection of a doctor's application for membership on a hospital staff because the hospital had failed to afford the applicant any opportunity to be heard. And in *Martino* v. *Concord Community Hosp. Dist., supra,* 233 Cal.App.2d 51, 56-57, the court reiterated the *Wyatt* holding and extended its requirement of procedural fairness to a situation in which an application for staff membership had simply been deferred rather than rejected. Although the *Wyatt* and *Martino* cases involve rejections of membership for a hospital staff rather than for a professional association, in view of the fiduciary responsibilities imposed on the defend-

ant associations because of their "public service" functions, the prior cases are not distinguishable from the present matter. In each instance, the courts uphold judicial review because denial of membership would effectively impair the applicant's right "to fully practice his profession." (174 Cal. App.2d at p. 715. Cf. *Rosner* v. *Eden Township Hospital Dist.* (1962) 58 Cal.2d 592, 598 [25 Cal.Rptr. 551, 375 P.2d 431].)[12]

Moreover, several recent out-of-state authorities provide additional support for the conclusion that defendants' membership decisions must be rendered pursuant to fair procedures. In *Blende* v. *Maricopa County Medical Society* (1964) 96 Ariz. 240 [393 P.2d 926], for example, the Arizona Supreme Court held that if a medical society's denial of a doctor's application for membership would impair the physician's practice of his profession "then his membership application may not be denied arbitrarily, but only on a showing of just cause established by the Society *under proceedings embodying the elements of due process.*" (Italics added; 393 P.2d at p. 930; see also *Sussman* v. *Overlook Hospital Assn., supra,* 95 N.J. Super. 418; *Silver* v. *Castle Memorial Hospital, supra,* 53 Hawaii 475.)

Our decision in *Pinsker I* drew upon the foregoing authority in concluding that "an applicant for membership [in defendant organizations] has a judicially enforceable right to have his application considered in a manner comporting with the fundamentals of due process, *including* the showing of cause for rejection." (Italics added; 1 Cal.3d at p. 166.) The development of the common law, reviewed above, buttresses the proposition evident from the very language of *Pinsker I*: a showing of "cause" for rejection is but one of the requirements of a nonarbitrary decision. In addition, an applicant for membership in defendant societies is entitled to have his application decided pursuant to a fair procedure. (See generally Sloss, *Procedural Due Process in Voluntary Associations* (1973) 48 State Bar J. 138.)

---

[12]Although the defendants in both *Wyatt* and *Martino* were public entities, neither decision relied on this factor in reaching the conclusion that procedural fairness was required in the admission process. Moreover, in *Willis* v. *Santa Ana etc. Hospital Assn.* (1962) 58 Cal.2d 806, 810 [26 Cal.Rptr. 640, 376 P.2d 568], our court explicitly held that private hospitals are under similar constraints to protect against arbitrary exclusion from membership. (See also *Sussman* v. *Overlook Hospital Assn.* (1967) 95 N.J. Super. 418 [231 A.2d 389]; *Silver* v. *Castle Memorial Hospital* (1972) 53 Hawaii 475 [497 P.2d 564]; *Bricker* v. *Sceva Speare Memorial Hospital* (1971) 111 N.H. 276 [281 A.2d 589, 592-593]; *Davidson* v. *Youngstown Hospital Association* (1969) 19 Ohio App.2d 246 [48 Ohio Ops.2d 371, 250 N.E.2d 892].)

b. ██ *Under common law principles, a "fair procedure" requires that before the denial of an application, an applicant be notified of the reason for the proposed rejection and given a fair opportunity to defend himself.*

Defendants further contend that even if they were legally required to utilize a "fair procedure" in passing on Dr. Pinsker's application, as we have said, they satisfied their obligation by conducting an investigation into Pinsker's case and by resting their rejection of his application on the information disclosed by that investigation. Although the trial court apparently agreed with this contention, we conclude that the procedure followed in the instant case does not meet minimal common law standards.

In *Cason* v. *Glass Bottle Blowers Assn., supra,* 37 Cal.2d 134, 143, this court declared: "It is a fundamental principle of justice that no man may be condemned or prejudiced in his rights without an opportunity to make his defense, and this principle is applicable not only to courts but also to labor unions and similar organizations." **(4)** We thus recognize that a basic ingredient of the "fair procedure" required under the common law is that an individual who will be adversely affected by a decision be afforded some meaningful opportunity to be heard in his defense. Every one of the numerous common law precedents in the area establishes that this element is indispensable to a fair procedure. (See, e.g., *Von Arx* v. *San Francisco G. Verein, supra,* 113 Cal. 377, 379-380; *Taboada* v. *Sociedad Espanola, etc., supra,* 191 Cal. 187, 191; *Cunningham* v. *Burbank Bd. of Realtors, supra,* 262 Cal.App.2d 211, 214.)

The common law requirement of a fair procedure does not compel formal proceedings with all the embellishments of a court trial (see, e.g., *Cason* v. *Glass Bottle Blowers Assn., supra,* 37 Cal.2d pp. 137, 143), nor adherence to a single mode of process. It may be satisfied by any one of a variety of procedures which afford a fair opportunity for an applicant to present his position. As such, this court should not attempt to fix a rigid procedure that must invariably be observed. Instead, the associations themselves should retain the initial and primary responsibility for devising a method which provides an applicant adequate notice of the "charges" against him and a reasonable opportunity to respond.[13] In drafting such

---

[13]Of course, if an unsuccessful applicant does not care to know the reason for his rejection or does not wish to contest his exclusion, there is no necessity for an association to conduct a meaningless procedure. Accordingly, it is permissible for an association to initially reject an applicant without explanation, so long as the association clearly indicates to the applicant that, if he desires, the association will inform him of the reason for the rejection and will afford him an opportunity to respond.

procedure, and determining, for example, whether an applicant is to be given an opportunity to respond in writing or by personal appearance, the organization should consider the nature of the tendered issue and should fashion its procedure to insure a *fair* opportunity for an applicant to present his position. Although the association retains discretion in formalizing such procedures, the courts remain available to afford relief in the event of the abuse of such discretion.

In the instant case defendants concede that Pinsker was not afforded any opportunity to respond to the charges raised against him. Although Pinsker contends that he had terminated "patient sharing" nearly six months prior to the January 1961 meeting, he was given no chance to demonstrate such termination, and, indeed, was apparently unaware that anyone still questioned his qualifications. Under these circumstances, we conclude that the procedure followed by the defendant association did not meet the minimum standards required under the common law.[14]

The case of *Wyatt* v. *Tahoe Forest Hospital Dist., supra,* 174 Cal.App. 2d 709, directly supports this conclusion. In *Wyatt,* as in the instant case, the defendant's ex parte investigation of an applicant's qualifications uncovered information which defendant contended warranted the rejection of plaintiff's application.[15] Despite the thoroughness of the investigation and the apparent reliability of the information gathered, the *Wyatt* court held that the applicant was still entitled to be accorded an opportunity to be heard in his own defense. (See also *Sussman* v. *Overlook Hospital Assn., supra,* 95 N.J. Super. 418 [231 A.2d 389, 393].)

Defendants suggest, however, that even if they did act improperly in denying Pinsker's application without affording him an opportunity to present his position, the error has been fully cured because Pinsker was af-

[14]Because we have determined that the failure to provide Pinsker an opportunity to present his position invalidates the associations' decision, we need not pass on plaintiff's additional contention that the hearsay evidence relied 'on by defendants was so insubstantial as to render the rejection arbitrary or capricious. (Cf. *Tesoriero* v. *Miller* (1949) 274 App.Div. 670 [88 N.Y.S.2d 87].) The authorities do make clear, however, that in this context the hearsay nature of the evidence would not in itself render the information insufficient. (See *Sussman* v. *Overlook Hospital Assn., supra,* 95 N.J. Super. 418 [231 A.2d 389, 393]; *Silver* v. *Castle Memorial Hospital, supra,* 53 Hawaii 475 [497 P.2d 564, 571].) The case of *Martin* v. *State Personnel Board* (1972) 26 Cal.App.3d 573 [103 Cal.Rptr. 306], relied on by plaintiff, involved an administrative hearing governed by Government Code section 11513, and is not applicable here.

[15]Indeed, the information uncovered by the investigation in *Wyatt* was of an entirely different magnitude than the matters disclosed in the instant case. In *Wyatt,* defendants learned that plaintiff had had his medical license revoked on two occasions, had been charged several times with procuring an illegal abortion, and had been fined for removing public property. (174 Cal.App.2d at pp. 711-712.)

forded a full hearing on the merits at the trial of this action. Dr. Pinsker was entitled, however, to a ruling on his membership application by the *defendant associations* pursuant to a fair procedure; the trial judge possessed neither the professional expertise nor the discretionary latitude of such associations, and consequently his decision is not an adequate substitute for a determination by such bodies. ■ Moreover, we believe as a matter of policy that the association itself should in the first instance pass on the merits of an individual's application rather than shift this burden to the courts. For courts to undertake the task "routinely in every such case constitutes both an intrusion into the internal affairs of [private associations] and an unwise burden on judicial administration of the courts." (*Ferguson* v. *Thomas* (5th Cir. 1970) 430 F.2d 852, 858.)

The case of *Ellis* v. *American Federation of Labor, supra,* 48 Cal.App. 2d 440, confirms this approach. In *Ellis,* after concluding that the defendant labor association had improperly suspended plaintiff without a hearing, the court declared through Justice Dooling: "This court will not undertake to inquire at this time whether the [plaintiff] committed any breach of its obligations . . . or was guilty of any conduct which would justify the suspension or revocation . . . after proper notice and a hearing. The very purpose of such hearing would be to determine those facts. Having determined that [plaintiff] may not legally be suspended or revoked without a hearing, it would be improper to substitute a hearing in this or the trial court for the hearing that [plaintiff] is entitled to have within the federation to which it belongs." (48 Cal.App.2d at p. 445. See also *Sussman* v. *Overlook Hospital Assn., supra,* 95 N.J. Super. 418.)[16]

Thus, we conclude that defendants should reconsider plaintiff's application for membership pursuant to a fair procedure.[17]

---

[16]Although the argument is not explicitly articulated, defendants also appear to contend that plaintiff "waived" his right to a hearing before the association because he never took the initiative to request one. Under the society's by-laws, however, it was clear that no right to a hearing existed, and under similar circumstances California courts have uniformly held that an applicant's failure to seek a hearing is no bar to judicial relief. (See, e.g., *Martino* v. *Concord Community Hospital Dist., supra,* 233 Cal.App.2d 51, 56; *Swital* v. *Real Estate Commissioner, supra,* 116 Cal.App.2d 677, 680; *Ellis* v. *American Federation of Labor, supra,* 48 Cal.App.2d 440, 444.)

[17]Although plaintiff claims that the improper denial of a hearing entitled him to an order compelling the societies to admit him immediately into membership, we find no precedent for such an order in a situation in which a rejection is defective because of the failure to provide a hearing. (Cf. *Rosner* v. *Eden Township Hospital Dist., supra,* 58 Cal.2d 592, 599 (admission to hospital staff compelled when grounds for rejection invalidated).) In all prior cases in which a hearing has been improperly denied, the courts have simply ordered that a hearing be afforded. (See, e.g., *Wyatt* v. *Tahoe Forest Hospital Dist., supra,* 174 Cal.App.2d 709, 716; *Martino* v. *Concord ·Community Hospital Dist., supra,* 233 Cal.App.2d 51, 60.)

3. ▮ *Defendant associations' rule prohibiting the delegation of orthodontic services to a dentist not educationally qualified for membership in their associations is neither arbitrary nor contrary to public policy, and an applicant's knowing violation of such rule serves as a permissible basis for the rejection of his application for membership.*

At the further proceedings, which we have outlined above, the applicability and validity of defendants' nondelegation regulation will inevitably be questioned and, because the issue has been fully briefed in this court, we address the matter.

The rule at issue here provides in full: "Use of Auxiliary Personnel.— The orthodontist has an obligation to protect the health of his patient by not delegating to a person less qualified any service or operation which requires the professional competence of an orthodontist. The orthodontist has a further obligation of supervising the work of all auxiliary personnel in the interests of rendering the best service to the patient." Pinsker concedes the validity of this rule as applied to "auxiliary personnel" not licensed to practice dentistry, but he attacks defendants' interpretation of this section as proscribing the sharing of patients with his partner, a licensed dentist.

▮ As an initial matter we note that in adjudicating a challenge to the society's rule as arbitrary a court properly exercises only a limited role of review. As the Arizona Supreme Court observed in *Blende* v. *Maricopa County Medical Society, supra,* 96 Ariz. 240 [393 P.2d 926, 930]: "In making such an inquiry, the court must guard against unduly interfering with the Society's autonomy by substituting judical judgment for that of the Society in an area where the competence of the court does not equal that of the Society . . . If the society has refused membership . . . through the application of a reasonable standard—one which comports with the legitimate goals of the Society and the rights of the individual and the public—then judicial inquiry should end." Only when a society rule is contrary to established public policy (see, e.g., *Rosner* v. *Eden Township Hospital Dist., supra,* 58 Cal.2d 592; *Bernstein* v. *Alameda- etc. Med. Assn., supra,* 139 Cal.App.2d 241; *Higgins* v. *American Society of Clinical Pathologists, supra,* 238 A.2d 665), or is so "patently arbitrary and unreasonable" as to be "beyond the pale of the law" (see *Falcone* v. *Middlesex County Medical Soc., supra,* 34 N.J. 582 [170 A.2d 791, 800]), should a court prohibit its enforcement.

On its face, the rule at issue appears quite reasonable, promoting high quality patient care by prohibiting orthodontists from delegating to less qualified personnel "any service or operation which requires the profes-

sional competence of an orthodontist." As noted, Dr. Pinsker does not challenge the general application of this provision but urges the arbitrariness only of defendants' interpretation of the section.

Defendants interpret the rule to preclude an orthodontist from delegating an orthodontic "service or operation" to any person who is not a "qualified" orthodontist: defendants, in turn, define a "qualified" orthodontist as one who meets the current educational and professional eligibility requirements for membership in their societies. Because Dr. Schleimer did not satisfy the educational requirements prevailing in 1959 and 1960,[18] defendants concluded that Pinsker's alleged sharing of patients with Schleimer constituted a violation of the rule.

Pinsker attacks this construction of the provision on several grounds. First, he contends that nothing in the section indicates that the principle of nondelegation applies to licensed dentists as well as to more traditional "auxiliary personnel," e.g., nurses, dental hygienists, and laboratory technicians. Second, he claims that since Dr. Schleimer's general dentistry license permits him to practice orthodontics defendants cannot properly categorize him as an "unqualified" orthodontist simply because he has not taken all the post-graduate courses currently required of an applicant for membership in their societies. Finally, Pinsker points out that in 1957 Dr. Schleimer did meet all the requirements for membership in defendant associations and thus possesses the same educational qualifications as many society members who joined the associations in 1957 or earlier; since defendants conceded at trial that all members of their society are considered "qualified" orthodontists, Pinsker claims it is arbitrary for defendants to treat Dr. Schleimer differently from other dentists who have comparable educational backgrounds. As discussed below, we conclude that none of these contentions is sufficient to invalidate defendants' interpretation of the rule in question.

First, although the wording of the rule is somewhat ambiguous, Pinsker has conceded that in June 1960 defendants informed him of the interpretation which they placed on the section. Under these circumstances, legal doctrines calling for the construction of ambiguous documents against their draftsmen have little place; in the private association context such rules are often drawn by laymen and so long as the society provides an

---

[18]At the time Dr. Pinsker applied for membership, an applicant was required to have been in the exclusive practice of orthodontics and to have completed an orthodontics course of a minimum of 1,500 hours at an approved dental school. These requirements were more stringent than in earlier years. Thus, for example, in 1957, a dentist was apparently eligible for membership if he had simply been in the exclusive practice of orthodontics for two years.

adequate and timely explanation an applicant should not be permitted to dispute the society's official interpretation.[19]

Second, the fact that California law designates Dr. Schleimer as "qualified" to practice orthodontics by virtue of his general dentistry license does not preclude defendant societies from establishing a higher standard of qualification for their own purposes. Judicial authorities have made it clear that one perfectly legitimate objective of professional associations is to attempt to elevate professional standards in order to attain quality medical and dental care. (See *Falcone* v. *Middlesex County Medical Soc., supra,* 34 N.J. 582 [170 A.2d 791, 800]; *Salter* v. *New York State Psycho. Ass'n* (1964) 14 N.Y.2d 100 [248 N.Y.S.2d 867, 870-871, 198 N.E.2d 250].) The imposition of additional educational requirements above those required for a state license certainly composes one permissible means of attaining such a goal. Moreover, with the continuing advances in medical science, a professional society may well conclude that "qualification" in a given specialty such as orthodontics calls for completion of some courses which concentrate on that specialty. Such additional educational requirements are precisely the kind of regulations which courts are usually ill-equipped to evaluate: the expert judgment of the professional association in these matters must generally prevail.

Finally, defendant societies may properly place Dr. Schleimer in a different category than individuals who may have comparable formal educational backgrounds but who have previously been admitted into the societies. "Grandfather clauses" in *statutory* eligibility schemes have long been accepted (see, e.g., *Ex parte Whitley* (1904) 144 Cal. 167 [77 P. 879]; *Watson* v. *Maryland* (1910) 218 U.S. 173 [54 L.Ed. 987, 30 S.Ct. 644]; Annot. 136 A.L.R. 207, 219-223). We cannot reasonably impose more rigid requirements on eligibility rules devised by nongovernmental bodies. Moreover, defendants could properly conclude that through participation in the associations' numerous professional activities, society members have been exposed to new professional developments not generally available to non-members.

In sum, we conclude that defendants have not acted arbitrarily in interpreting their "auxiliary personnel" rule as prohibiting Pinsker from

---

[19]Our reaction would be entirely different, however, if defendants had rejected Pinsker's application without giving him any fair warning as to the actual meaning of the rule; under such circumstances, the ambiguity of the rule could well render an immediate rejection arbitrary. Although defendants' initial denial of Pinsker's application in May 1960 appears vulnerable to such criticism, defendants apparently recognized the unfairness of the procedure and thereafter reinstated Pinsker's application and afforded him an explanation of the rule at issue.

sharing patients with Schleimer. In reaching this conclusion, however, we intimate no opinion as to whether Pinsker has in fact continued "patient-sharing" subsequent to having been informed that such practice violated defendants' rules. We hold only that if defendants properly conclude on the basis of fair proceedings that Pinsker has in fact continued sharing patients with Schleimer, such a practice would provide a nonarbitrary ground for rejecting his application.

### 4. Conclusion.

In our initial decision we held that "[b]ecause of the unique position in the field of orthodontics occupied by defendant . . . organizations . . . , the associations must be viewed as having a fiduciary responsibility with respect to the acceptance or rejection of membership applications." (*Pinsker* v. *Pacific Coast Soc. of Orthodontics, supra,* 1 Cal.3d 160, 166.) In our present decision we have explained that under the common law, one obligation flowing from this "public service" status is that defendant organizations may not reject an application without affording the applicant a fair opportunity to answer the charges against him. Because defendants failed to afford Dr. Pinsker such an opportunity, we have concluded that he is entitled to an injunctive order requiring defendants to reconsider his application pursuant to a fair procedure.

The judgment is reversed and the case is remanded to the trial court with instructions to issue an injunction compelling defendant associations to set aside the rejection of plaintiff's application and to reconsider such application pursuant to a fair procedure as provided herein.

Wright, C. J., McComb, J., Mosk, J., Burke, J., Sullivan, J., and Clark, J., concurred.