**BONNEVILLE PROPERTIES, INCOR-PORATED, a corporation, Plaintiff and Respondent,**

v.

**Dan SIMONS, Defendant and Appellant.**

**No. 18223.**

Supreme Court of Utah.

Jan. 23, 1984.

Parker M. Nielson, Mary Lou Godbe, Salt Lake City, for defendant and appellant.

Dennis K. Poole, Salt Lake City, for plaintiff and respondent.

OAKS, Justice:

A realtor, Simons, appeals the trial court's award of judgment altering his commission split with another realtor, Bonneville Properties. The issue is whether the terms of a unilateral offer of a property listed with the Salt Lake Board of Realtors Multiple Listing Service (MLS) are determined by the MLS rules and regulations or by general contract law. We hold the rules determinative and accordingly reverse a judgment to the contrary.

Simons and Bonneville Properties were both members of the Multiple Listing Service, which, at the relevant time, required its members to sign an agreement (1) to observe the rules and regulations of the service, (2) to submit controversies to an

Arbitration and Ethics Committee, and (3) to comply with the findings of that Committee. Simons advertised his exclusive listing of the Fashion Fabrics warehouse through the MLS in September 1974. Pursuant to the MLS rules in effect at that time, he also listed his proposed commission split: 40% to the listing broker and 60% to the selling broker. Rule 17 provided:

> When one member sells or exchanges property listed with the Service by another member, the gross commission shall be divided on a previously agreed basis. Each member shall file with the Multiple Listing Service a statement showing on what basis he will divide his commission with other members.... *The notice of a commission split must remain in effect for at least 20 days. A notice of change must be filed in writing with the Multiple Listing Service. The Multiple Listing Service will notify the other members of all changes made, and the notices will take effect upon notification to the members.*

(Emphasis in original.)

In December 1974, an agent for Bonneville Properties saw the warehouse listing and asked Simons about the terms desired by Fashion Fabrics. Bonneville did not seek agreement or modification of the published commission split, as would have been possible under the rules. Bonneville then contacted Jelco, Inc., with the idea described below.

Jelco, Inc., had conveyed a majority of its interest in the property that is now the Salt Lake International Center to A.K. Utah Properties. A.K. Utah needed a remaining parcel of land owned by Robert B. Swaner Company in order to develop the property. Swaner had agreed to convey its International Center property to A.K. Utah if A.K. Utah would purchase property satisfactory to Swaner and make a tax-free exchange. Jelco did not represent A.K. Utah or Swaner. Bonneville contacted Jelco to propose the Fashion Fabrics warehouse as a suitable property for A.K. Utah to acquire and exchange with Swaner. At this same time,

Bonneville advised Simons that A.K. Utah was a prospective buyer. Bonneville did not represent Swaner, Jelco, or A.K. Utah. Bonneville did not have a client and did not show the property to any party.

On January 2, 1975, Simons filed a written notice of change of commission split, reversing his former figures to give the listing broker 60% and the selling broker 40%. The change was published to the members and was effective on January 10, 1975. At this time, Simons was in touch with several prospective buyers, and there were no written offers on the subject property. On February 3, 1975, A.K. Utah executed contingent documents to purchase Fashion Fabrics' warehouse, and the transaction closed on March 24, 1975. According to the commission split effective when A.K. Utah's written offer was made, Simons split the $100,000 commission by keeping $60,000 and paying $40,000 to Bonneville. In this action, Bonneville seeks to establish its right to the additional amount it would have received under the 60% split applicable when the property was listed.

The district court found that the MLS rules did not specify what would be done when a commission split arrangement was changed between the time negotiations commenced and the sale. The court thereupon awarded Bonneville the amount due under the commission split in effect at the time of listing (plus interest), in effect making Simons' unilateral offer irrevocable, because Bonneville's efforts to accept it had been "significant." In contrast, we conclude that such a rule—even if derived from general contract law—is inappropriate when the terms of the listing broker's unilateral offer are sufficiently defined by the MLS rules and regulations, as interpreted by the Real Estate Board.

The MLS rules in force at the time of this controversy required disputing members to submit their controversies to an Arbitration and Ethics Committee. This was not done, but the stipulated testimony of B.L. Scott, Executive Secretary of the Salt Lake Board of Realtors, showed that

when the Committee was called upon to arbitrate commission split controversies during this period it relied on the split in effect on the date of acceptance of a written offer. Bonneville admitted that it had been advised of this policy when it complained to Mr. Scott about Simons' change of the split.

In effect, the MLS rule provided two different methods for dividing a commission: (1) a generally published commission split, which could be changed unilaterally by written notice to the members, and (2) a commission split agreed between two members, which could only be changed by further agreement. In this case, Simons began with a generally published commission split, which he later changed unilaterally as the rule permitted. The commission split was never made the subject of agreement between Simons and Bonneville, which would have prevented a unilateral change. We conclude that absent such an agreement the MLS rules and regulations defining the terms of the offer allowed Simons to change the commission split in the manner done in this case.

It is generally accepted that "[i]n all matters of policy or of the internal economy" of professional and fraternal organizations "the rules by which the members have agreed to be governed constitute the charter of their rights." *Lawson v. Hewell*, 118 Cal. 613, 619, 50 P. 763, 764 (1897). Similarly,

> A voluntary association may, without direction or interference by the courts, for its government, adopt a constitution, by-laws, rules and regulations which will control as to all questions of discipline, or internal policy and management, and its right to interpret and administer the same is as sacred as the right to make them.

*State ex rel. Givens v. Marion County*, 233 Ind. 235, 238, 117 N.E.2d 553, 555

(1954). *Cf. Vance v. Fordham*, Utah, 671 P.2d 124, 129 (1983) (peer participation in official definition of "unprofessional conduct"); *State ex rel. Baker v. Intermountain Farmers Association*, Utah, 668 P.2d 503 (1983) (bylaw governing patronage credits in agricultural cooperative); *Blende v. Maricopa County Medical Society*, 96 Ariz. 240, 245, 393 P.2d 926, 930 (1964) (membership in medical society).

Although courts must guard against undue interference with the internal relations of an occupational association, they should not enforce rules or practices that are contrary to established public policy or so " 'patently arbitrary and unreasonable' as to be beyond the pale of the law." *Pinsker v. Pacific Coast Society of Orthodontists*, 12 Cal.3d 541, 558, 116 Cal.Rptr. 245, 258, 526 P.2d 253, 266 (1974), *quoting Falcone v. Middlesex County Medical Society*, 34 N.J. 582, 598, 170 A.2d 791, 800 (1961). In addition to the requirement that the MLS rules be reasonable in content, they must also be applied subject to the requirement of good faith that inheres in every contractual relation. *See Leigh Furniture and Carpet Co. v. Isom*, Utah, 657 P.2d 293, 306 (1982).

The MLS rule allowing a unilateral change in a commission split prior to an accepted offer where there has been no agreement on the split is neither unreasonable nor contrary to public policy. Furthermore, there is no claim of lack of good faith in this case.[1]

Because we find the MLS rules binding on both parties and dispositive of this controversy, we need not reach the other issues argued by the parties, such as Simons' contention that Bonneville was not entitled to any commission because it was not a "selling broker" under the MLS rules.

---

1. When he made the change, Simons knew of A.K. Utah's interest in the property and of several other potential buyers. He also knew that Bonneville's agent lacked commercial real estate experience, so that if the property were sold to A.K. Utah his own negotiation task would be complex as compared with Bonneville's single contribution: suggesting the name of a potential purchaser. This circumstance itself suggests a good faith reason for Simons' change in the commission split.

The judgment for plaintiff Bonneville Properties is reversed, and the case is remanded with directions to enter judgment for the defendant. Costs to defendant.

HALL, C.J., and STEWART, HOWE and DURHAM, JJ., concur.